IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>*Defendants*. | No. 1:25-cv-00113-SLS |

## DECLARATION OF DELL FAULKINGHAM

I, Dell Faulkingham, declare as follows:

1. I am over the age of 18. Except as expressly indicated, the facts stated herein are based on my personal knowledge, including my experience in the pharmaceutical industry, my work at Teva Pharmaceuticals USA, Inc. (Teva), and my review of the business records of the company. If called to testify, I could truthfully and competently testify to those facts.

2. I am the Senior Vice President, U.S. Innovative Medicines at Teva. Teva is a wholly owned, indirect subsidiary of Teva Pharmaceuticals Industries, Ltd., a global pharmaceutical company headquartered in Israel. Teva is an industry leader in the development, manufacture, and marketing of innovator, generic, and biosimilar pharmaceutical products in the United States.

3. In my capacity as Senior Vice President, U.S. Innovative Medicines, I lead the team in charge of the commercialization of innovative products at Teva, including AUSTEDO and AUSTEDO XR. My team coordinates the sales and marketing of innovative products at Teva and in that capacity we coordinate with Teva's research and development as well as regulatory affairs

1

personnel to ensure that our strategies align. We also make decisions about which products to prioritize based on the company's goals, projections, manufacturing capacity, and pertinent regulatory developments. My team also coordinates internal decision-making regarding inventory preparation activities for innovative products.

## TEVA'S INVESTMENTS IN ITS MEDICINE PORTFOLIO

4. Teva invests substantial resources into creating and marketing its portfolio of medicines—both innovator new drugs and high-quality, lower-cost generic drugs.

5. To develop its innovator products, Teva must begin by identifying and pursuing new drug[1] candidates, in the hopes of creating new therapeutic options for patients. That process is extremely expensive, and it is riddled with dead-ends: most drug candidates never receive FDA approval. From start to finish, Teva's development of a new drug may take up to 5-10 years.

6. Even once Teva identifies a potential drug candidate, it still must invest further resources to bring that product to patients. For example, Teva must develop a scalable manufacturing process, subject the drug candidate to rigorous clinical trials, secure FDA approval to market the product,[2] and protect its intellectual property with patents, including the potential for costly patent litigation.

7. To enable continued investment in research and development, Teva must be able to recoup the costs incurred in researching and developing all its new drug candidates with revenue it receives from marketing the few products that survive the entire process. When Teva does so,

---

[1] Unless otherwise indicated, I use the terms "drug" and "medicine" to include both small-molecule and biologic products.

[2] Even after a manufacturer files a New Drug Application (NDA) or Biologics License Application (BLA), manufacturers commonly file multiple supplemental applications to a single NDA or BLA, including for different dosage forms and strengths.

it creates a virtuous cycle: Teva can use the revenue it gains from marketing new life-improving therapies it has already developed to fund the development of even more therapies, and so on.

8. That cycle relies on Teva's ability to market its innovator products at market prices during statutory-exclusivity periods. Federal law provides sponsors of innovator drugs with various statutory-exclusivity periods, during which they may market their products free from competition by generic versions of those products. Innovator manufacturers make most of their revenue on their products during those exclusivity periods because they sell a higher volume of their product at market prices when no generic version is available.

9. Without the ability to rely on those statutory-exclusivity periods to recoup its investments, the virtuous cycle of research and development would become a vicious cycle instead: If Teva does not earn sufficient revenue by marketing its products to cover the costs of researching and developing those products—including those related to the many drug candidates that never made it to market—Teva must reduce or terminate its investments in further research and development. If Teva does not invest sufficient funds in further research and development, its pipeline of new products will dry up, and Teva will be deprived of the revenue it would otherwise have earned by marketing those products. And patients will never receive new therapies that would otherwise have improved or extended their lives.

## TEVA'S AFFECTED INNOVATOR PRODUCTS

10. AUSTEDO and AUSTEDO XR are life-changing medicines that benefit patients with certain movement disorders. FDA approved AUSTEDO in April 2017 (NDA 208082) with an indication for Huntington's disease chorea; an additional indication for tardive dyskinesia was

approved in August 2017.³  Teva Branded Pharmaceutical Products R&D LLC is the application holder for AUSTEDO.  FDA approved AUSTEDO XR in April 2023 (NDA 216354).⁴  Teva Neuroscience, Inc. is the application holder for AUSTEDO XR.

11.  Huntington's disease is a rare, terminal genetic disease that tends to cause uncontrollable movements of all muscles in the body, called chorea.  Huntington's disease chorea particularly affects muscles in patients' arms, legs, face, and tongue.  Tardive dyskinesia is charactered by involuntary movements and is associated with long-term use of antipsychotic medications, and therefore many tardive dyskinesia patients have underlying mental illness that can be exacerbated by suboptimal treatment of tardive dyskinesia.  AUSTEDO and AUSTEDO XR are indicated in adults for the treatment of chorea associated with Huntington's disease and tardive dyskinesia.  The active ingredient is deutetrabenazine, a vesicular monoamine transporter 2 (VMAT2) inhibitor.

12.  AUSTEDO XR is the extended-release formulation of AUSTEDO.  It gives patients the same benefits as AUSTEDO in a once-daily pill as opposed to the twice-a-day dosing schedule for AUSTEDO.  AUSTEDO XR uses osmotic pressure to deliver deutetrabenazine at a controlled rate throughout the day.  AUSTEDO XR particularly benefits patients with HD and tardive dyskinesia by lessening pill burden and helping to improve adherence in patient populations that often have severe movement disorders, and, in the case of TD, underlying mental illness.

---

³ FDA has approved nine supplements to AUSTEDO's NDA, from June 2018 through November 2024.  FDA, Approval Date(s) and History, Letters, Labels, Reviews for NDA 208082, *available at* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm.

⁴ FDA has approved two supplements to the NDA for AUSTEDO XR, in May 2024 and July 2024.  FDA, Approval Date(s) and History, Letters, Labels, Reviews for NDA 216354, *available at* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm.

13. AUSTEDO is available in 6 mg, 9 mg, and 12 mg tablets. AUSTEDO XR is available in 6 mg, 9 mg, 12 mg, 18 mg, 24 mg, 30 mg, 36 mg, 42 mg, and 48 mg extended-release tablets. AUSTEDO XR is also available in 4-week titration kits in 12 mg, 18 mg, 24 mg, and 30 mg configurations.

14. Teva (and its predecessors) invested significant resources in researching and developing both AUSTEDO and AUSTEDO XR. Those efforts were rewarded with medicines that work: AUSTEDO successfully reduces movement symptoms in Huntington's disease chorea and tardive dyskinesia and patients when compared with placebo. Teva committed substantial additional investments in developing AUSTEDO XR and seeking FDA approval. Teva's NDA for AUSTEDO XR was supported by additional clinical study data demonstrating that the extended-release formulation is just as effective as twice-daily dosing.

15. Teva continues to invest in addressing the unmet needs of patients who benefit from AUSTEDO and AUSTEDO XR. For example, Teva conducted a 3-year IMPACT-TD Registry study, the largest of its kind, to evaluate tardive dyskinesia patients outside a clinical-study setting.

## THE DRUG PRICE NEGOTIATION PROGRAM HARMS TEVA

16. Teva must comply with the requirements of the Inflation Reduction Act's (IRA's) Drug Price Negotiation Program. On January 17, 2025, the Centers for Medicare & Medicaid Services (CMS) announced that it had selected two of Teva's innovator products—AUSTEDO and AUSTEDO XR—for inclusion in the Drug Price Negotiation Program. That selection means CMS will impose price caps on those products beginning January 1, 2027.

17. As a result of CMS's selection of AUSTEDO and AUSTEDO XR, Teva must engage in a process with CMS that the IRA calls a "negotiation." In fact, the process will not involve any genuine negotiation. Even though there are opportunities for initial "informational" meetings with CMS and some back-and-forth until the final price is "set," the practical reality is

that CMS will "propose" a price cap for Teva's products; Teva will have one written opportunity to request a higher price cap; and CMS will respond with its final "offer."

18. Teva takes seriously CMS's representation that it will consider the manufacturer's counteroffer "as CMS reviews data and develops its final offer." 2027 Guidance at 62. But the statutory reality is that Teva will have no choice but to accept CMS's final offer. If Teva were to attempt to resist that offer, I understand that Teva would be subject to a penalty of up to 95 percent of its total U.S. revenues for AUSTEDO and AUSTEDO XR. That penalty would be financially ruinous.

19. Teva also has no way to avoid paying this penalty. I understand that the IRA provides for "suspension" of this 95-percent penalty if a manufacturer terminates its Medicare Part D agreements and its Medicaid rebate agreement for all of its drugs—which would also make Teva's products ineligible for federal reimbursements under Medicare Part B. In other words, the statute's supposed "suspension" of the penalty demands complete withdrawal from Medicare and Medicaid.

20. Teva cannot take that step. Withdrawing all of Teva's thousands of products from Medicare and Medicaid would cause Teva to lose an unsustainable amount of revenue and jeopardize Teva's future. It would also deprive vulnerable patient populations served by those programs of the critical therapies that Teva offers. Teva cannot accept either result, so it must participate in the Drug Price Negotiation Program and accede to CMS's demanded price.

21. Teva has no meaningful opportunity—that is, an opportunity that could materially affect the outcome—to participate in the Drug Price Negotiation Program's process of selecting or setting prices for AUSTEDO and AUSTEDO XR.

22. When CMS subjects AUSTEDO and AUSTEDO XR to price caps under the Drug Price Negotiation Program, Teva will earn less revenue for those products than it would if CMS had not selected AUSTEDO or AUSTEDO XR. Teva will also suffer a distinct injury when it is deprived of that revenue as a result of an illusory negotiation—one that forces Teva to accept the government-dictated price, with no meaningful way for Teva to participate or object to CMS's ultimate decision.

23. The Drug Price Negotiation Program also creates uncertainty that impairs Teva's ability to invest in its pipeline of new and improved innovator products. Teva cannot be reasonably sure that it will be afforded the opportunity to recoup its investments in research and development of both new medicines and improvement on existing therapies, creating a disincentive to invest resources in those endeavors. For every discontinued investment, patients lose an opportunity for a newer and/or better therapy.

**CMS'S GUIDANCE FURTHER HARMS TEVA**

24. CMS has issued guidance that purports to implement the Drug Price Negotiation Program.

25. I understand that the IRA's statutory term for a drug that is eligible to be selected for the Drug Price Negotiation Program is a Qualifying Single Source Drug. I further understand that one consequence of that statutory definition is that a small-molecule drug cannot be selected until it has been approved for at least seven years, but that CMS's guidance effectively removes that limitation so that certain drugs can be selected sooner.

26. But for CMS's guidance, AUSTEDO XR could not have been selected for the Drug Price Negotiation Program because it was approved pursuant to a different NDA than AUSTEDO and has been approved for fewer than seven years. As a result, Teva will be deprived of revenue it would earn if it remained free to sell AUSTEDO XR in arm's-length, market-rate transactions.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

_____
Dell Faulkingham

February 21, 2025