IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TEVA PHARMACEUTICALS USA, INC., *et al.*,

    *Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, *et al.*,

    *Defendants*.

No. 1:25-cv-00113-SLS

### DECLARATION OF CARRIE GROFF

I, Carrie Groff, declare as follows:

    1.    I am over the age of 18.  Except as expressly indicated, the facts stated herein are based on my personal knowledge, including my experience in the pharmaceutical industry, my work at Teva Pharmaceuticals USA, Inc. (Teva), and my review of the business records of the company.  If called to testify, I could truthfully and competently testify to those facts.

    2.    I am the Vice President of Portfolio and New Product Launch at Teva.  Teva is a wholly owned, indirect subsidiary of Teva Pharmaceuticals Industries, Ltd., a global pharmaceutical company headquartered in Israel.  Teva is an industry leader in the development, manufacture, and marketing of generic pharmaceutical products in the United States.

    3.    In my capacity as Vice President of Portfolio and New Product Launch, I lead Teva's U.S. generic product portfolio and launch teams, which includes responsibility for selecting new generic products for development, and overseeing Teva's generic product-development strategy from the time Teva chooses to develop a given product through the time Teva launches that product into the market.  My team and I value new product opportunities, coordinate with

Teva's regulatory affairs personnel to ensure that our strategies align, and make decisions about which products to prioritize based on the company's goals, projections, manufacturing capacity, and pertinent regulatory developments. My responsibilities for Teva's generic products include timeline alignment taking into consideration product approval, operational readiness, and legal status. My team also coordinates internal decision-making regarding inventory preparation activities.

## TEVA'S INVESTMENTS IN ITS GENERIC PORTFOLIO

4. Teva invests substantial resources into creating and marketing its portfolio of medicines—both innovator new drugs and high-quality and lower-cost generic drugs. In 2023, Teva invested nearly $1 billion into research and development across its entire portfolio of products. A significant portion of those investments went to generics,[1] and Teva has more than a thousand generic products in its development pipeline.

5. Developing generics requires substantial investments: Teva invests hundreds of millions of dollars annually into developing and manufacturing generic medicines. From start to finish, Teva's development of a generic medicine may take up to seven years. The cost often amounts to tens of millions of dollars, and even more if capital expenditures are required. If the product is subject to patent litigation against the sponsor of the referenced innovator product, litigation expenses add to the cost of development, and those litigation expenses can run over $10 million if a case must be litigated through appeals.

6. Biosimilars are especially costly to develop. They are subject to many of the same costs as generics. But unlike generics, sponsors of biosimilars must also conduct expensive clinical trials to demonstrate safety. And biosimilar manufacturers may also invest additional

---

[1] Unless otherwise noted, I use "generics" to refer to both generic drugs and biosimilars.

money into advertising their products—again unlike AB-rated generics, which are substituted at the pharmacy counter—adding still further expense.

7. To recoup its investments in developing generics, Teva must be able to sell a sufficient volume of those products. Teva's products must therefore gain enough market share, which requires Teva to convince its customers, including wholesalers, pharmacies, hospitals and clinics, to switch from a branded product to a generic.

8. Generics compete with branded drugs on price. By law, a generic must be therapeutically equivalent to the reference product. That means generic manufacturers must differentiate their products from branded equivalents by offering lower prices. Of course, that is by design: The purpose of generic competition is to bring down prices.

9. If a generic cannot compete on price, it is unlikely to gain substantial market share. Similarly, in my experience, payors and pharmacy benefit managers are unlikely to add generic products to their formularies—meaning they will not provide insurance coverage for those products—if they will not save any money by doing so. Even if payors and pharmacy benefit managers were to add a generic that costs about the same as a branded drug to their formularies, in my experience they would be unlikely to give such a generic favorable placement, leaving consumers and their prescribers with no incentive to choose it.

10. I am aware of studies and government reports demonstrating that generic prices are strongly and negatively correlated with the number of generic competitors. According to some such estimates, generics tend to be sold at about a 25 to 50 percent discount to the branded drug when there is only one generic seller, but that discount can rise to well over 90 percent when there are 6 or more generic sellers.[2] Teva's experience matches those findings: The first generic entrant

---

[2] FDA, *Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices*, at 9 (Dec. 2019), https://www.fda.gov/media/133509/download.

is priced at a significant discount to the branded drug and the generic price declines significantly as more generics enter the market.

11. Under such circumstances, it is doubly difficult for generic manufacturers to recoup their investments in developing their products. Very low prices mean that manufacturers will earn little revenue for each sale, and a large number of competitors means that each generic will attain less market share.

12. For these reasons, Teva closely monitors expected market conditions upon generic entry when deciding whether it will continue developing, and ultimately launch, a generic product. In doing so, Teva forecasts the likely generic prices upon launch, given Teva's expectations about potential competitors' behavior. When Teva determines that generic prices will likely be too low to make launching economical, it decides not to launch a generic product, even if it has the legal right to do so.

13. Uncertainty also plays a key role in those decisions. If there appears to be a strong chance that launching a generic product will ultimately not be economical because of excessively low generic prices, Teva ceases developing that product so that it may commit those resources elsewhere. Teva cannot justify committing the substantial funds needed to prepare a generic product for launch unless it can be reasonably sure that launching will generate sufficient revenue to recover those funds, enabling Teva to invest in further product development.

14. Biosimilar competition relies on similar dynamics. Although biosimilars are not necessarily fungible with their reference biologics, evidence suggests that biosimilars must be priced substantially lower than their reference products to gain market share. For example, I have reviewed evidence that manufacturers of biologics have prevented biosimilars from gaining substantial market share by offering large rebates on their branded products. In those

circumstances, a biosimilar cannot undercut the price of the biologic by a sufficient margin to induce consumers, payors, and pharmacy benefit managers to switch to the biosimilar without offering prices so low that the biosimilar would incur losses.

15. If Teva projected that a biosimilar product in its development pipeline would not gain sufficient market share to recoup Teva's costs in developing that product, Teva would cease investing in its development and decide not to launch the product. When faced with substantial uncertainty about whether a biosimilar product in its development pipeline will gain sufficient market share to recoup Teva's costs in developing that product, Teva would likely elect to devote its scarce resources toward developing other products instead.

16. Loss of generic competition would have serious adverse consequences for patients and the whole American healthcare system. I am aware of statistics demonstrating that over 90 percent of all prescriptions dispensed in the United States are filled with generic drugs, yet those drugs account for only a small fraction of total spending.

## THE DRUG PRICE NEGOTIATION PROGRAM

17. When an innovator product is subject to a price cap under the Drug Price Negotiation Program, generic competition against that innovator product is undermined because the generic is forced to compete against an artificially low price. CMS's price caps have resulted in much lower prices for selected innovator drugs: Most of the price caps the agency has announced so far are greater than 50 percent.

18. When the prices of innovator products are forcibly reduced to those levels, generics will have little or no room to compete. To attract substantial market share, generic manufacturers must try to price their products significantly below the price of the innovator product. But when the innovator product is already priced at a large discount to the prevailing market price, a generic manufacturer will likely be unable to do so while still earning a profit on its sales. Of course, if a

generic manufacturer cannot earn a profit on its sales, it cannot rationally sell its product, and doing so would not enable the manufacturer to recoup its research and development costs. At a minimum, generics will have to be sold at prices far lower than they would be if the innovator products had not been selected. Generic competitors will therefore earn far less revenue than they would but for a given innovator product's selection.

19. Selection of an innovator product for the Drug Price Negotiation Program also creates substantial uncertainty regarding the status of generic competition. It is not possible to know, at the time of selection, what price CMS will ultimately impose on the product. That indeterminacy is compounded by the difficulty of predicting how other potential generic entrants may react to the imposition of a price cap under the Drug Price Negotiation Program.

20. For that reason, when the reference drug for one of Teva's forthcoming generic products is, or is likely to be, selected for the Drug Price Negotiation Program, Teva may elect to invest its scarce resources in other ways instead. If it does so, patients and payors will be deprived of important generic products they would otherwise have access to.

## TEVA'S AFFECTED GENERIC PRODUCTS

21. Teva plans to launch the following generics that will be affected by the Drug Price Negotiation Program.

### *XTANDI (Enzalutamide)*

22. CMS selected XTANDI (Enzalutamide) for the Drug Price Negotiation Program in January 2025. XTANDI will therefore be subject to a price cap beginning January 1, 2027.

    a.    XTANDI is a branded drug that treats advanced prostate cancer.

    b.    XTANDI is approved under two NDAs. FDA approved NDA No. 203415 in August 2012, which authorizes a capsule form of XTANDI. FDA approved NDA No. 213674 in August 2020, which authorizes a tablet form of XTANDI.

c. Teva filed an application on August 31, 2016 to market generic Enzalutamide capsules, which FDA has approved. Teva's application contained a certification that the patents listed in FDA's Orange Book were invalid, not infringed, or unenforceable.

d. Teva was sued as a result of filing its application to market generic Enzalutamide capsules. The lawsuit against Teva was dismissed pursuant to a settlement agreement on June 18, 2018. That settlement left intact certain patents covering XTANDI, the latest of which expires on August 13, 2027 (U.S. Patent No. 7,709,517).

e. Pursuant to the terms of the settlement, Teva plans to launch a generic capsule form of Enzalutamide that will compete with XTANDI before the expiration of the '517 patent. Teva was among the first filers of generic Enzalutamide capsules and Teva's product is anticipated to be among the first to launch.

*OFEV (Nintedanib)*

23. CMS selected OFEV (Nintedanib) for the Drug Price Negotiation Program in January 2025. OFEV will therefore be subject to a price cap beginning January 1, 2027.

a. OFEV is a branded drug that treats a lung disease called idiopathic pulmonary fibrosis.

b. OFEV has been approved under NDA No. 205832 since October 2014.

c. Teva filed an application on July 30, 2024, to market generic Nintedanib capsules. Teva's application contained a certification that the patents listed in FDA's Orange Book were invalid, not infringed, or unenforceable.

d. Teva was not sued as a result of filing its application to market generic OFEV capsules, so the only barrier to Teva's marketing generic Nintedanib is a statutory-

exclusivity period that expires on September 26, 2026, with a six-month extension covering certain potential versions of generic Nintedanib that expires on March 26, 2027.

    e.    Teva plans to launch a generic form of Nintedanib that will compete with OFEV. Teva is not among the first filers for generic Nintedanib, so Teva will launch its generic six months after the first generic enters the market due to various exclusivity provisions. Teva anticipates the first generic to be launched in April 2026, which would mean Teva's generic is expected to launch in October 2026.

*XARELTO (Rivaroxaban)*

24.    CMS selected XARELTO (Rivaroxaban) for the first year of the Drug Price Negotiation Program. XARELTO will therefore be subject to a price cap amounting to a 62 percent discount beginning January 1, 2026.

    a.    XARELTO is a branded drug that treats blood clots.

    b.    XARELTO has been approved under NDA Nos. 22406 and 202430 for tablet forms of XARELTO since July and November 2011, respectively. A liquid suspension form of XARELTO has also been approved under NDA No. 215859 since December 20, 2021.

    c.    Teva filed an application on August 30, 2018, to market 10, 15, and 20 mg generic versions of Rivaroxaban tablets. Teva's applications contained certifications that the patents listed in FDA's Orange Book were either invalid, not infringed, or unenforceable.

    d.    Teva was sued as a result of filing its applications to market generic versions of XARELTO. The lawsuit as to the 10, 15, and 20 mg Rivaroxaban tablets was dismissed pursuant to a settlement on April 8, 2020.

  e. Pursuant to the terms of the settlement agreement, Teva plans to launch a generic tablet form of Rivaroxaban that will compete with XARELTO starting on March 15, 2027. Teva's generic is expected to be among the first to market.

*LINZESS (Linaclotide)*

25. CMS selected LINZESS (Linaclotide) for the Drug Price Negotiation Program in January 2025. LINZESS will therefore be subject to a price cap beginning January 1, 2027.

  a. LINZESS is a branded drug that treats irritable-bowel syndrome.

  b. LINZESS has been approved under NDA No. 202811 since August 2012.

  c. Teva filed an application on August 30, 2016, to market 145 and 290 mcg Linaclotide capsules. Teva filed an application on November 7, 2017, to market a 72 mcg Linaclotide capsule. Teva's applications contained certifications that the patents listed in FDA's Orange Book were invalid, not infringed, or unenforceable.

  d. Teva was sued as a result of filing its applications to market generic versions of LINZESS. The lawsuits were dismissed against Teva pursuant to settlements in February 2020 and May 2021, respectively.

  e. Teva plans to launch a generic form of Linaclotide that will compete with LINZESS on March 31, 2029. Teva was among the first filers on the 145 mcg and 290 mcg Linaclotide capsules, and is the sole first filer on the 72 mcg Linaclotide capsules. Teva's generic for all strengths is expected to be among the first to launch, all of which are expected to enter the market on March 31, 2029.

*XIFAXAN (Rifaximin)*

26. CMS selected XIFAXAN (Rifaximin) for the Drug Price Negotiation Program in January 2025. XIFAXAN will therefore be subject to a price cap beginning January 1, 2027.

      a.      XIFAXAN is a branded drug that treats irritable bowel syndrome with diarrhea and hepatic encephalopathy.

      b.      XIFAXAN has been approved under NDA No. 22554 (550 mg) since March 2010, and NDA No. 21361 (200 mg) since May 2004.

      c.      Teva filed an application on December 17, 2015, to market 550 mg strength of Rifaximin. Teva's application contained a certification that the patents listed in FDA's Orange Book were either invalid, not infringed, or unenforceable.

      d.      Teva was sued on March 23, 2016, as a result of filing its application to market a generic version of XIFAXAN. The lawsuit was dismissed pursuant to a settlement on September 17, 2018.

      e.      Pursuant to the terms of the settlement, Teva plans to launch its 550 mg Rifaximin product that will compete with XIFAXAN starting on January 1, 2028. Teva was the first-filed generic and is anticipated to be the first and only generic to launch on that date; FDA has confirmed that Teva has retained its 180-Day exclusivity as the first company to file a Paragraph IV challenge to XIFAXAN.

***OTEZLA (Apremilast)***

27.      CMS selected OTEZLA (Apremilast) for the Drug Price Negotiation Program in January 2025. OTEZLA will therefore be subject to a price cap beginning January 1, 2027.

      a.      OTEZLA is a branded drug that treats psoriatic arthritis and plaque psoriasis.

      b.      OTEZLA has been approved under NDA Nos. 205437 and 206058 since March 2014 and September 2014, respectively. OTEZLA comes in a titration pack, containing combinations of 10 mg, 20, mg, and 30 mg strength tablets, as well as bottles

of the 20 mg and 30 mg tablets. All approved indications for OTEZLA provide for the patient to start treatment with the appropriate titration pack and be followed by maintenance dosing using the 20 mg or 30 mg strength tablets.

      c.      Teva filed an application on March 21, 2018 to market Apremilast tablets. Teva's application contained a certification that the patents listed in FDA's Orange Book were either invalid, not infringed, or unenforceable.

      d.      Teva was sued on June 28, 2018, as a result of filing its application to market a generic version of Apremilast. The lawsuit was dismissed pursuant to a settlement on January 26, 2021.

      e.      Pursuant to the terms of the settlement, Teva plans to launch generic Apremilast tablets that will compete with OTEZLA starting in August 2028. Teva's generic is expected to be among the first generics to launch.

## THE DRUG PRICE NEGOTIATION PROGRAM HARMS TEVA

28.     When XTANDI, OFEV, XARELTO, LINZESS, XIFAXAN, and OTEZLA are subject to price caps, Teva will be prevented from launching its generic Enzalutamide, Rivaroxaban, Nintedanib, Linaclotide, Rifaximin, and Apremilast products at the arm's-length, free-market rates that would prevail absent price caps on the corresponding innovator products. In fact, if price caps are sufficiently low for any of those innovator products, Teva may be unable to launch its corresponding generic product at all. As a result, Teva will be deprived of revenue that it would have earned absent CMS's price caps.

29.     Teva's ability to compete with brand-name products will be hindered by price controls on those products. When Teva launches its generic Rivaroxaban on March 15, 2027, it will be forced to compete against the 62-percent discount on branded XARELTO that CMS has

11

imposed, which significantly decreases Teva's ability to offer a lower price capable of recouping Teva's investment costs.

30. When XTANDI, XARELTO, LINZESS, XIFAXAN, and OTEZLA are subject to price caps, Teva's license agreements to sell Enzalutamide, Rivaroxaban, Linaclotide, Rifaximin, and Apremilast will also be impaired because the right to sell those generic products according to Teva's settlement agreements with the brand-name manufacturers will become less valuable.

31. Teva will also suffer a distinct injury when it is deprived of that revenue and those contractual rights without any opportunity to participate or otherwise be heard in the process that is responsible for depriving Teva of its property.

32. Finally, the Drug Price Negotiation Program creates uncertainty that impairs Teva's ability to invest in its pipeline of new generic products.  Teva cannot be reasonably sure that it will be afforded the opportunity to recoup its investments in research and development, creating a disincentive to invest resources in those endeavors.

## CMS'S GUIDANCE FURTHER HARMS TEVA

33. CMS has issued guidance that purports to implement the Drug Price Negotiation Program.  At least two aspects of that guidance inflict additional harms on Teva.

### *Qualifying Single Source Drug*

34. I understand that the IRA's statutory term for a drug that is eligible to be selected for the Drug Price Negotiation Program is a Qualifying Single Source Drug.  I further understand that one consequence of that statutory definition is that a small-molecule drug cannot be selected until it has been approved for at least seven years, but that CMS's guidance effectively removes that limitation so that certain drugs can be selected sooner.

35. But for CMS's guidance, the tablet form of XTANDI could not have been selected for the Drug Price Negotiation Program because it has been approved for less than seven years.

As a result, Teva's Enzalutamide *capsule* product will be forced to compete against a price-controlled *tablet* version of XTANDI, on top of a price-controlled *capsule* version of XTANDI.

      a.      All other things being equal, patients and prescribers may prefer tablets to capsules because, for example, they are more shelf stable, able to be split, and sometimes easier to swallow. Prescribers and patients may well prefer the tablet form of XTANDI unless Teva's capsule form of Enzalutamide can offer significant price savings over the tablet form.

      b.      Because the tablet form of XTANDI will be subject to an IRA price cap as a result of CMS's guidance, Teva's capsule form of Enzalutamide will likely be unable to offer significant price savings over the tablet form of XTANDI. As a result, Teva will be deprived of revenue it would earn if the tablet form of XTANDI could continue to be sold in arm's-length, market-rate transactions.

36.      But for CMS's guidance, the suspension form of XARELTO could not have been selected for the Drug Price Negotiation Program because it had been approved for less than seven years when it was selected. Teva's generic tablet form of Rivaroxaban will therefore be forced to compete against an additional price-capped version of XARELTO. As a result, Teva will be deprived of revenue it would earn if the suspension form of XARELTO could continue to be sold in arm's-length, market-rate transactions.

***"Bona Fide" Marketed***

37.      I understand that the IRA provides for price caps to be lifted upon generic entry according to the following schedule: If generic competition begins after CMS publishes its list of selections, but before the "negotiation" period ends, the drug or biologic remains selected, but no price cap is imposed, and the drug or biologic's selection terminates in the year after its price cap

would otherwise have taken effect. If generic competition begins after the end of the negotiation period, but before April 1 of the year in which the drug's price cap takes effect, the price cap applies during that year, but the drug's selection terminates in the following year. Finally, if generic competition begins after March 31 of any year in which the drug's price cap applies, the price cap applies during that year *and* the following year, terminating only thereafter.

38. Thus, for a drug that was selected for inclusion in the 2027 list, if a generic is "approved and marketed" between November 2, 2025 through March 31, 2027, the branded drug remains subject to the price cap through December 31, 2027. If the generic is "approved and marketed" between April 1, 2027 and March 31, 2028, the branded drug remains subject to the price cap for an extra year—through December 31, 2028.

39. For these reasons, the timing of generic entry has significant consequences for the duration of price caps. Generic entry on or before March 31 of a year in which a drug's price cap applies is the difference between 9 and 21 additional months of price caps.

40. I understand that the IRA defines generic entry sufficient to terminate price caps as the date on which the first sale of a generic product occurs. I further understand that CMS's guidance effectively rewrites that definition to give CMS the power to determine when generic competition is sufficiently "bona fide" to terminate price caps.

41. CMS has stated publicly that it will determine whether a generic is "bona fide" marketed based on sales data reflected in Medicare Part D Prescription Drug Event (PDE) data and Medicaid Average Manufacturer Price (AMP) data.

42. I understand that CMS has acknowledged that PDE and AMP data are inherently time-lagged. In my experience, AMP and PDE data contain a significant lag, such that they do not reflect the extent of generic uptake until many months after generic marketing begins.

43. I also understand that CMS has acknowledged that AMP data will be unavailable for the two months preceding the crucial March 31 cutoff, and no PDE data for the month preceding the cutoff. Therefore, any generic launched in the months preceding March 31 cannot—under CMS's guidance—qualify as bona fide marketed in time to remove an innovator drug from price controls for the following year. The result is that the generic will be forced to compete against a price-controlled branded drug for an additional year.

44. As a result of CMS's guidance, there is a significant chance that XARELTO LINZESS, XIFAXAN, XTANDI, OTEZLA, and OFEV will be subject to at least an additional year of price caps.

    a. Pursuant to the terms of its settlement agreement, Teva intends to launch its 10, 15, and 20 mg Rivaroxaban tablets on March 15, 2027, just two weeks before the crucial March 31, 2027 cutoff date for XARELTO to be removed from the Program for the following year. Because CMS's guidance is clear that its determination of "bona fide marketing" depends on PDE and AMP data, and those data will not exist for generics launched in March, it is virtually certain that XARELTO will be subject to an additional year of price controls.

    b. Pursuant to the terms of its settlement agreements, Teva plans to launch its Linaclotide product on March 31, 2029, the same day as the cutoff for removing a drug from the Program for the following year. Because CMS's guidance is clear that its determination of "bona fide marketing" depends on PDE and AMP data, and those data will not exist for generics launched in March, it is virtually certain that LINZESS will be subject to an additional year of price controls.

    c.  Pursuant to the terms of its settlement agreement, Teva plans to launch its 550 mg Rifaximin product on January 1, 2028, just three months before the critical March 31 cutoff. At best, that would provide just one month of AMP data and two months of PDE data for CMS to review. In Teva's experience, that is insufficient time to generate significant utilization levels reflected in PDE or AMP data. That is particularly true because Teva's generic will compete against only the 550 mg strength of XIFAXAN, and not the 200 mg. If CMS deems those utilization levels insufficient as of March 31, 2028, Teva will be forced to compete against a price-controlled version of XIFAXAN for an additional year.

    d.  Pursuant to the terms of its settlement agreement, Teva anticipates launching its generic Enzalutamide capsules before the expiration of XTANDI's '517 patent on August 13, 2027. That would provide Teva less than eight months to sell enough product to satisfy CMS's "bona fide marketing" standard by March 31, 2028 such that XTANDI is removed from the Program for the following year. In Teva's experience, even eight months may not be enough time to generate significant utilization levels reflected in PDE or AMP data, particularly because Teva's generic is a capsule, not the tablet form of XTANDI which dominates the market. If CMS deems those utilization levels insufficient as of March 31, 2028, Teva will be forced to compete against a price-controlled version of XTANDI for an additional year.

    e.  Pursuant to the terms of its settlement agreement, Teva plans to launch its generic Apremilast product in August 2028. That would provide Teva only about seven months to sell enough product to satisfy CMS's "bona fide marketing" standard by March 31, 2029 such that OTEZLA is removed from the Program for the following year. Like

16

with XTANDI, in Teva's experience seven months on the market may be an insufficient amount of time to generate significant utilization levels. If CMS deems those utilization levels insufficient as of March 31, 2029, Teva will be forced to compete against a price-controlled version of OTEZLA for an additional year.

      f.      Teva anticipates launching is generic Nintedanib product six months after the first generic enters the market. Teva currently anticipates the first generic to be launched in April 2026, which would make Teva's entry in October 2026. If the first generic delays entry, however, Teva's entry date will be similarly delayed. Delays in generic entry will make it more difficult to generate significant utilization levels reflected in PDE or AMP data by March 31, 2027. And if CMS deems those utilization levels insufficient by that date, Teva will be forced to compete against a price-controlled version of OFEV for an additional year.

45.      When XTANDI, OFEV, XARELTO, LINZESS, XIFAXAN, and OTEZLA are subject to price caps for longer than they would be absent CMS's guidance, Teva's generic Enzalutamide, Nintedanib, Rivaroxaban, Linaclotide, Rifaximin, and Apremilast products will be forced to compete with price-capped innovator drugs for longer than they would be absent CMS's guidance, therefore gaining less revenue and market share. CMS's guidance will therefore harm Teva by costing it revenue that it would otherwise earn if XTANDI, OFEV, XARELTO, LINZESS, XIFAXAN, and OTEZLA could be sold in arm's-length, market-rate transactions sooner.

46.      For manufacturers like Teva, which makes both branded and generic products, declining revenue from generics also threatens to hamper the company's ability to develop innovative products, to the detriment of patients nationwide.

47. CMS's guidance also impairs Teva's contractual rights to sell its generic Enzalutamide, Rivaroxaban, Linaclotide, Rifaximin, and Apremilast products by reducing the expected value of those rights.

48. I understand that CMS also claims the authority to continually reassess whether a generic clears its "bona fide marketing" threshold, such that if CMS determines that a generic drug manufacturer is no longer engaged in "bona fide marketing," the branded product could become re-eligible for negotiation and selection. Teva must factor into its decisions whether to invest in and launch generic products both the uncertainty of whether CMS will determine that a generic is "bona fide" marketed in the first place, as well as the ever-present possibility that CMS will re-subject a branded drug to price caps and stifle generic competition. If Teva cannot be confident that it will be able to receive a return on its investment, it is likely to discontinue research and development on that product or even cancel a planned launch, depriving Teva of its investments.

49. Finally, CMS's guidance independently injures Teva by depriving it of revenue and the value of its contractual rights without any opportunity to be heard. CMS's "bona fide" standard is largely opaque, subjective, and leaves Teva without any meaningful way to persuade the agency that the competition created by its generic products is "bona fide" and should be deemed sufficient to lift price caps imposed on innovator products.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

_____
Carrie Groff

February 20, 2025