**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, *et al.*, <br><br> Defendants.[1] | Civil Action No. 25-113 (SLS) |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

MICHELLE R. BENNETT
Assistant Branch Director
Federal Programs Branch

STEPHEN M. PEZZI
 Senior Trial Counsel
CASSANDRA M. SNYDER
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch

*Counsel for Defendants*

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Robert F. Kennedy, Jr., Secretary of Health and Human Services, is automatically substituted as a defendant in his official capacity for his predecessor, Acting Secretary Dorothy A. Fink.  Dr. Mehmet Oz, Administrator of the Centers for Medicare & Medicaid Services, is likewise automatically substituted as a defendant in his official capacity for his predecessor, Acting Administrator Stephanie Carlton.

## TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................... **1**

**ARGUMENT** ...................................................................................................... **2**

    **I.**    **CONGRESS EXPRESSLY PRECLUDED JUDICIAL REVIEW OVER PLAINTIFFS' STATUTORY CLAIMS.** ................................... **2**

    **II.**    **PLAINTIFFS' STATUTORY CLAIMS LACK MERIT.** ............................. **15**

        A.  CMS appropriately considered different forms of the same drug in the negotiation process, as required by the IRA. ............................................. 16

        B.  CMS's bona fide marketing standard is consistent with the statutory text.............................................................................................................. 23

    **III.**    **PLAINTIFFS' DUE PROCESS CLAIMS LACK MERIT.** .......................... **29**

        A.  The Negotiation Program does not deprive Teva of any protected property interests.................................................................................... 29

        B.  Participation in the Negotiation Program is voluntary. ................................... 33

**CONCLUSION** ................................................................................................... **35**

# TABLE OF AUTHORITIES

**CASES**

*Amazon Servs. LLC v. Dep't of Agric.*,
  109 F.4th 573 (D.C. Cir. 2024) ............................................................... 15

*Animal Legal Def. Fund, Inc. v. Glickman*,
  204 F.3d 229 (D.C. Cir. 2000) ............................................................... 28

*Ascension Borgess Hosp. v. Becerra*,
  557 F. Supp. 3d 122 (D.D.C. 2021),
  *aff'd*, 61 F.4th 999 (D.C. Cir. 2023) .................................................... 14

*AstraZeneca Pharms. LP v. HHS*,
  137 F.4th 116 (3d Cir. 2025) ......................................................*passim*

*AstraZeneca Pharms. LP v. HHS*,
  No. 24-1819, 2024 WL 5219932 (3d Cir. Sept. 12, 2024) ..................... 12

*Bakran v. DHS*,
  894 F.3d 557 (3d Cir. 2018) ............................................................... 6, 8

*Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*,
  956 F.3d 689 (5th Cir. 2020) ............................................................... 25

*Bowen v. Mich. Acad. of Fam. Physicians*,
  476 U.S. 667 (1986) ...................................................................... 3, 5, 10

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021) ............................................................................. 32

*Cary v. Curtis*,
  44 U.S. 236 (1845) ................................................................................. 5

*Changji Esquel Textile Co. v. Raimondo*,
  40 F.4th 716 (D.C. Cir. 2022) ............................................................... 14

*Children's Hosp. Ass'n of Tex. v. Azar*,
  933 F.3d 764 (D.C. Cir. 2019) ............................................................... 25

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
  587 U.S. 262 (2019) ............................................................................. 24

*Coyne-Delany Co. v. Cap. Dev. Bd.*,
  616 F.2d 341 (7th Cir. 1980) ............................................................... 35

*Cuban Cigar Brands, N.V. v. Tabacalera Popular Cubana, Inc.*,
  No. 02-23124-CIV, 2008 WL 4279641 (S.D. Fla. Sept. 16, 2008)..........................................30

*Cummings v. Premier Rehab Keller, PLLC*,
  596 U.S. 212 (2022)...........................................................................................................35

*Dayton Area Chamber of Com. v. Becerra*,
  696 F. Supp. 3d 440 (S.D. Ohio 2023) .............................................................29, 33, 34, 35

*DCH Reg'l Med. Ctr. v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019)....................................................................................*passim*

*Ezekwo v. N.Y.C. Health & Hosps. Corp.*,
  940 F.2d 775 (2d Cir. 1991).............................................................................................32

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022).....................................................................................14, 15

*Fla. Health Scis. Ctr., Inc. v. HHS*,
  830 F.3d 515 (D.C. Cir. 2016)...........................................................................7, 8, 9, 10

*Garelick v. Sullivan*,
  987 F.2d 913 (2d Cir. 1993)..........................................................................................33, 34

*Grace v. Barr*,
  965 F.3d 883 (D.C. Cir. 2020).........................................................................................10

*Ipsen Biopharmaceuticals, Inc. v. Azar*,
  No. 1:16-cv-02372, 2020 WL 3402344 (D.D.C. June 19, 2020) ......................................22

*Jafarzadeh v. Duke*,
  270 F. Supp. 3d 296 (D.D.C. 2017)..................................................................................14

*Jama v. ICE*,
  543 U.S. 335 (2005)....................................................................................................18, 23

*John Balko & Assocs. v. Sec'y of HHS*,
  555 F. App'x 188 (3d Cir. 2014) ........................................................................................8

*Knapp Med. Ctr. v. Hargan*,
  875 F.3d 1125 (D.C. Cir. 2017).................................................................................*passim*

*Kontrick v. Ryan*,
  540 U.S. 443 (2004)............................................................................................................5

*Lewis v. U.S. Parole Comm'n*,
   743 F. Supp. 3d 181 (D.D.C. 2024) ...................................................................... 14

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ............................................................................................... 26

*M.M.V. v. Garland*,
   1 F.4th 1100 (D.C. Cir. 2021) ................................................................................. 4

*Mach Mining, LLC v. EEOC*,
   575 U.S. 480 (2015) ............................................................................................... 12

*Mallinckrodt ARD LLC v. Verma*,
   444 F. Supp. 3d 150 (D.D.C. 2020) ...................................................................... 19

*McNary v. Haitian Refugee Ctr., Inc.*,
   498 U.S. 479 (1991) ................................................................................................. 9

*Mercy Hosp., Inc. v. Azar*,
   891 F.3d 1062 (D.C. Cir. 2018) .................................................................. 7, 8, 9, 11

*N. Am. Butterfly Ass'n v. Wolf*,
   977 F.3d 1244 (D.C. Cir. 2020) ............................................................................. 13

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
   26 F.4th 960 (D.C. Cir. 2022) ............................................................................... 15

*Novo Nordisk Inc. v. Becerra*,
   No. 3:23-cv-20814, 2024 WL 3594413 (D.N.J. July 31, 2024),
   *appeal pending*, No. 24-2510 (3d Cir. Aug. 19, 2024) ..................................... 2, 15

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ............................................................................... 13

*O'Bannon v. Town Ct. Nursing Ctr.*,
   447 U.S. 773 (1980) ............................................................................................... 32

*Old Dearborn Distrib. Co. v. Seagram-Distillers Corp.*,
   299 U.S. 183 (1936) ............................................................................................... 32

*Palisades Gen. Hosp. Inc. v. Leavitt*,
   426 F.3d 400 (D.C. Cir. 2005) ............................................................................... 10

*Palmore v. United States*,
   411 U.S. 389 (1973) ................................................................................................. 5

*ParkView Med. Assocs. v. Shalala*,
    158 F.3d 146 (D.C. Cir. 1998) ............................................................ 9, 10

*Patchak v. Zinke*,
    583 U.S. 244 (2018) ........................................................................... 5, 10

*Perkins v. Lukens Steel Co.*,
    310 U.S. 113 (1940) ............................................................................... 35

*Reno v. Bossier Parish Sch. Bd.*,
    528 U.S. 320 (2000) ............................................................................... 24

*Pugin v. Garland*,
    599 U.S. 600 (2023) ......................................................................... 24, 27

*Rock River Health Care, LLC v. Eagleson*,
    14 F.4th 768 (7th Cir. 2021) .................................................................. 32

*Rotkiske v. Klemm*,
    589 U.S. 8 (2019) ................................................................................... 10

*San Bernardino Mountains Cmty. Hosp. Dist. v. HHS*,
    63 F.3d 882 (9th Cir. 1995) ................................................................... 25

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
    No. 23-975, 2025 WL 1520964 (U.S. May 29, 2025) ............................ 26

*Shah v. Azar*,
    920 F.3d 987 (5th Cir. 2019) ................................................................. 35

*St. Francis Hosp. Ctr. v. Heckler*,
    714 F.2d 872 (7th Cir. 1983) ................................................................. 34

*Tex. All. for Home Care Servs. v.Sebelius*,
    681 F.3d 402 (D.C. Cir. 2012) ........................................................ 6, 7, 9

*Transitional Hosps. Corp. of La. v. Shalala*,
    222 F.3d 1019 (D.C. Cir. 2000) ............................................................. 25

*U.S. Dep't of Just. v. Fed. Lab. Rels. Auth.*,
    981 F.2d 1339 (D.C. Cir. 1993) ............................................................. 15

*United States v. Menasche*,
    348 U.S. 528 (1955) ............................................................................... 24

*Valancourt Books, LLC v. Garland*,
   82 F.4th 1222 (D.C. Cir. 2023) ............................................................... 35

*Vanda Pharms., Inc. v. CMS*,
   98 F.4th 483 (4th Cir. 2024),
   *cert. denied*, 145 S. Ct. 1047 (2025) .................................................. 23

*Yale New Haven Hosp. v. Becerra*,
   56 F.4th 9 (2d. Cir. 2022) ....................................................... 3, 4, 8, 14

*Zhu v. Gonzales*,
   411 F.3d 292 (D.C. Cir. 2005) ....................................................... 24, 25

## U.S. CONSTITUTION

U.S. Const. art. III, § 1 ......................................................................... 5

## STATUTES

8 U.S.C. § 1160(e) ................................................................................. 9

8 U.S.C. § 1252(e)(3)(A)(ii) ............................................................... 10

21 U.S.C. § 355(b)(4)(A) ..................................................................... 18

21 U.S.C. § 355(c) ............................................................................... 17

21 U.S.C. § 355(c)(1) ........................................................................... 17

21 U.S.C. § 355(c)(2) ........................................................................... 17

21 U.S.C. § 355(c)(3) ........................................................................... 17

21 U.S.C. § 355(c)(4) ........................................................................... 18

21 U.S.C. § 355(c)(5)(A) ..................................................................... 18

26 U.S.C. § 223(c)(2)(G)(ii)(II) .......................................................... 27

26 U.S.C. § 5000D .............................................................................. 33

28 U.S.C. § 52(a) ................................................................................. 22

38 U.S.C. § 8126(h)(5) .................................................................................. 20

42 U.S.C. § 262(a) ....................................................................................... 17

42 U.S.C. § 1320f(b)(4)(A)(i) ........................................................................ 20

42 U.S.C. § 1320f(c)(1) ................................................................................. 20

42 U.S.C. § 1320f-1 ................................................................................ 11, 25

42 U.S.C. § 1320f-1(c)(1)(B) ........................................................................ 24

42 U.S.C. § 1320f-1(d)(2)(B)(ii) ................................................................... 20

42 U.S.C. § 1320f-1(d)(3) ............................................................. 1, 16, 17, 19

42 U.S.C. § 1320f-1(e)(1) ....................................................................... 25, 27

42 U.S.C. § 1320f-1(e)(1)(A) ........................................................................ 21

42 U.S.C. § 1320f-1(e)(1)(A)(iii) ........................................................... *passim*

42 U.S.C. § 1320f-1(e)(1)(B)(iii) .............................................. 16, 23, 24, 26

42 U.S.C. § 1320f-1(f)(1)(A) .................................................................... 25, 26

42 U.S.C. § 1320f-1(f)(1)(B)(ii)(I)(bb) ........................................................ 26

42 U.S.C. § 1320f-1(f)(1)(B)(ii)(III)(aa) ...................................................... 26

42 U.S.C. § 1320f-1(f)(1)(B)(ii)(III)(bb) ...................................................... 26

42 U.S.C. § 1320f-1(f)(3)(B) ......................................................................... 26

42 U.S.C. § 1320f-2(a)(1) .............................................................................. 21

42 U.S.C. § 1320f-2(a)(4)(A) ................................................................... 20, 21

42 U.S.C. § 1320f-3(b)(2)(B) ........................................................................ 20

42 U.S.C. § 1320f-3(c)(1)(A) ........................................................................ 20

42 U.S.C. § 1320f-3(c)(1)(C) ........................................................................ 20

42 U.S.C. § 1320f-3(e)(1)(D) ................................................................... 16, 17

42 U.S.C. § 1320f-5(a)(2) ........................................................................... 16, 17, 19

42 U.S.C. § 1320f-7 ................................................................................ 4, 5, 13, 14

42 U.S.C. § 1320f-7(2) .................................................................................... *passim*

42 U.S.C. §§ 1395 *et seq.* ..................................................................................... 4

42 U.S.C. § 1395nn(i)(3)(I) ................................................................................... 4

42 U.S.C. § 1395w-3a(c)(6)(A) ........................................................................... 20

42 U.S.C. § 1395w-102(e) ................................................................................... 22

42 U.S.C. § 1395w-104(b)(3)(C)(i) ...................................................................... 34

42 U.S.C. § 1395w-111(i)(1) ............................................................................... 31

42 U.S.C. § 1395w-114b(g)(1)(C)(ii) .................................................................. 27

42 U.S.C. § 1396r-8(k)(2) .................................................................................... 22

42 U.S.C. § 1396r-8(k)(5) .................................................................................... 20

## REGULATIONS

21 C.F.R. § 314.3 ................................................................................................ 17

21 C.F.R. § 314.70(h) .......................................................................................... 18

## OTHER AUTHORITIES

Center for Drug Evaluation and Research, *Manual of Policies & Procedures* § 5018.2, "NDA Classification Codes," (December 8, 2022), https://www.fda.gov/media/94381/download .... 18

CMS, *HHS Announces 15 Additional Drugs Selected for Medicare Drug Price Negotiations in Continued Effort to Lower Prescription Drug Costs for Seniors* (Jan. 17, 2025), https://perma.cc/X9QG-YKZK ....................................................................... 11

CMS, *Medicare Drug Price Negotiation Program: Final Guidance* (Oct. 2, 2024), https://perma.cc/J6JE-HHRS ................................................................... *passim*

*Determination*, Webster's Third New International Dictionary 616 (1993) ................................. 6

Letter from Phillip L. Swagel, Dir., Cong. Budget Off. to Hon. Jodey Arrington, Chairman, Comm. on the Budget, U.S. House of Reps., and to Hon. Michael C. Burgess, U.S. House of Reps (Dec. 21, 2023), https://perma.cc/9A9B-6SM6 ............................................................ 17

Teva, AUSTEDO® XR (deutetrabenazine) Extended-Release Tablets, New Once-Daily Formulation of AUSTEDO®, Now Available in the U.S. (May 15, 2023), https://www.tevapharm.com/news-and-media/latest-news/austedo-xr-deutetrabenazine-extended-release-tablets-new-once-daily-formulation-of-austedo-now-avai/ .......................... 19

## INTRODUCTION

In Count I, Teva asks this Court to conclude that Congress enacted a statutory scheme in which Austedo is eligible for price negotiation, but Austedo XR is not. Why? Essentially, because Austedo is taken as two pills of deutetrabenazine per day, while Austedo XR is taken as one pill of deutetrabenazine per day. Similarly, in Count II, Teva asserts that Congress enacted a statutory scheme in which any selected drug can be excluded from the Drug Price Negotiation Program, permanently, as long as any manufacturer makes a single sale of a single pill of a generic equivalent—even if everyone knows this is a one-off, bad faith, sham transaction, well compensated by the brand-name manufacturer, for the sole purpose of getting the brand-name drug out of price negotiation. On Plaintiffs' view, the manufacturers can then divide the spoils, with the American taxpayer holding the bag—often (as here) to the tune of billions of dollars per drug.

Unsurprisingly, Congress did not, in fact, enact such a self-defeating scheme—as the plain text of the statute indicates, and as its structure and purpose put beyond any doubt. In selecting drugs for negotiation, the Centers for Medicare & Medicaid Services (CMS) is required to aggregate spending data "across dosage forms and strengths of the drug, including new formulations of the drug, such as an extended release formulation." 42 U.S.C. § 1320f-1(d)(3)(B). And in Teva's own words, "AUSTEDO XR is the extended-release formulation of AUSTEDO." Am. Compl. ¶ 89, ECF No. 9. As for the requirement that a generic is actually "marketed" before its brand-name equivalent is excluded from the Negotiation Program, 42 U.S.C. § 1320f-1(e)(1)(A)(iii), it seems that Teva has nothing to worry about, as it apparently "intends to market those generics to the maximum extent possible," Teva's Mem. in Opp'n to Defs.' Cross-Mot. for Summ. J. & Reply in Supp. of Teva's Mot. for Summ. J. (Pls.' Opp'n & Reply) at 36, ECF No. 35. That would easily satisfy this statutory requirement, on either Teva's or CMS's interpretation.

But the Court need not reach the merits of Teva's statutory claims, because Congress also provided expressly that "[t]here shall be no administrative or judicial review" of the very sort of agency determinations that Plaintiffs challenge here: (1) CMS's "selection of drugs" for negotiation under § 1320f-1(b); (2) its "determination of negotiation-eligible drugs" under

§ 1320f-1(d); and (3) its "determination of qualifying single source drugs" under § 1320f-1(e).  42 U.S.C. § 1320f-7(2).  Although Plaintiffs struggle mightily to muddy the jurisdictional waters, it really is that simple.  That is why Judge Quraishi had no trouble dismissing materially identical claims—relying on D.C. Circuit precedent—in "a mere two sentences."  Pls.' Opp'n & Reply at 15 n.4; *see Novo Nordisk Inc. v. Becerra*, No. 3:23-cv-20814, 2024 WL 3594413, at *3 (D.N.J. July 31, 2024), *appeal pending*, No. 24-2510 (3d Cir. Aug. 19, 2024).  Contrary to Plaintiffs' apparent assumption, the brevity and simplicity of that analysis is not a point in their favor.

That leaves Teva's due process challenge.  As with the preclusion issue, every court to address Teva's due-process theory has rejected it.  The most recent example comes from the first appellate opinion on the merits of the Negotiation Program, in which a unanimous Third Circuit panel agreed with the district court in Delaware that "[t]here is no protected property interest in selling goods to Medicare beneficiaries (through sponsors or pharmacy benefit plans) at a price higher than what the government is willing to pay when it reimburses those costs."  *AstraZeneca Pharms. LP v. HHS*, 137 F.4th 116, 125-26 (3d Cir. 2025).  The absence of any protected property interest is fatal to Plaintiffs' due process claim, without the need for any further analysis.

The Court should thus dismiss Plaintiffs' statutory claims for lack of subject-matter jurisdiction, and enter summary judgment for Defendants on Plaintiffs' due process claims.

## **ARGUMENT**

## I.    **CONGRESS EXPRESSLY PRECLUDED JUDICIAL REVIEW OVER PLAINTIFFS' STATUTORY CLAIMS.**

The animating premise of Plaintiffs' statutory claims (Counts I and II) is that CMS has selected the wrong drugs for participation in the Negotiation Program.  In particular, Teva laments that Austedo XR—what Teva markets as "the extended-release formulation of AUSTEDO"— "was eligible for selection only because of CMS's definition of a Qualifying Single Source Drug, . . . because it shares an active moiety with AUSTEDO and Teva holds both NDAs."  Am. Compl. ¶¶ 89, 93.  Teva further professes a fear that, due to CMS's bona-fide marketing standard, other

drugs may remain eligible for selection as a "qualifying single source drug" for too long, despite the presence of some amount of generic competition.

Those theories turn out to be meritless. *See infra*, Section II. But right or wrong on the merits, Teva's statutory claims—both of which are about how CMS has selected (or will select) drugs for participation in the Negotiation Program—collide directly with Congress's decision to expressly preclude judicial review over those very sorts of agency decisions: in particular, (1) CMS's "selection of drugs" for negotiation under § 1320f-1(b); (2) its "determination of negotiation-eligible drugs" under § 1320f-1(d); and (3) its "determination of qualifying single source drugs" under § 1320f-1(e). 42 U.S.C. § 1320f-7(2). All of Plaintiffs' arguments to the contrary lack merit—both as a matter of plain text and, at least as importantly for current purposes, as a matter of D.C. Circuit precedent.

**a.** Plaintiffs begin with the assertion that "accepting the government's view" about the statute's preclusive effect "requires casting aside the longstanding presumption in favor of judicial review." Pls.' Opp'n & Reply at 2. But Defendants fully acknowledged the "strong presumption that Congress intends judicial review of administrative action." Defs.' Mem. of Law in Supp. of their Cross-Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. (Defs.' Br.) at 10, ECF No. 29 (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)).[2] Defendants also explained, however, why that presumption does little work here, due to D.C. Circuit precedent interpreting other preclusion provisions in the Medicare statute, which use the same language as this one. When Congress "provides that 'there shall be no administrative or judicial review' of specified agency actions, its intent to bar review is clear," and the presumption is overcome. *DCH*

---

[2] Plaintiffs make much of who bears the burden on this issue. *See* Pls.' Opp'n & Reply at 6. Nothing turns on that here, because Defendants would prevail even if Teva were correct that the government must "carry" a "substantial burden" to show preclusion. *Id.* In any event, even in the context of a statutory provision that precludes judicial review, the D.C. Circuit has emphasized that "[t]he plaintiffs bear the burden of establishing jurisdiction." *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017); *accord Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 16-17 n.1 (2d. Cir. 2022) ("[O]ur independent judgment is that the *Knapp* rule" about who bears the burden "is correct.").

*Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 505-06 (D.C. Cir. 2019) (quoting 42 U.S.C. § 1395nn(i)(3)(I)).  The only question then becomes "whether the challenged action falls 'within the preclusive scope' of the statute."  *Id.* at 506 (quoting *Knapp*, 875 F.3d at 1128); *accord M.M.V. v. Garland*, 1 F.4th 1100, 1107 (D.C. Cir. 2021) (holding that the "presumption of reviewability" had been overcome because "Congress obviously foreclosed judicial review" over "several broad categories of agency action"); *Yale New Haven Hosp.*, 56 F.4th at 25 ("There is nothing in the Supreme Court's or our caselaw to suggest that courts are permitted, much less required, to read in extratextual limitations on the *scope* of provisions in which Congress has clearly and unambiguously manifested its preclusive intent.").

Here, using the same language that was at issue in *DCH Regional* and *Knapp*, Congress provided that "[t]here shall be no administrative or judicial review" of the relevant agency actions—that is, CMS's "selection of drugs," its "determination of negotiation-eligible drugs," or its "determination of qualifying single source drugs."  42 U.S.C. § 1320f-7.  Accordingly, the general presumption in favor of judicial review is overcome, and the only question is whether Teva's statutory claims "fall[] 'within the preclusive scope' of the statute." *DCH Reg'l*, 925 F.3d at 506 (quoting *Knapp*, 875 F.3d at 1128).

Plaintiffs repeatedly protest that if the preclusion provision applies here, "CMS would be able to redefine the statute *however* it wants . . . and manufacturers would have no legal redress." Pls.' Opp'n & Reply at 2-3.  To be clear, Defendants have never argued that the IRA's preclusion provision covers *all* agency actions under this statute—only those listed in 42 U.S.C. § 1320f-7(2). But setting that aside, Teva is broadly correct that, for agency actions (like this one) that fall "within the preclusive scope" of the statute, *Knapp*, 875 F.3d at 1128, there will be no "judicial scrutiny," Pls.' Opp'n & Reply at 3.  Drug companies may not like that outcome, but that was Congress's choice.

That choice was not unusual.  Within Medicare alone, Congress has enacted dozens of similar provisions.  *See, e.g.*, 42 U.S.C. §§ 1395 *et seq.* (repeatedly using the phrase "no administrative or judicial review").  And it is well settled that, at least within outer bounds not

4

relevant here,[3] Congress's "control over the jurisdiction of the federal courts is plenary." *Patchak v. Zinke*, 583 U.S. 244, 252 (2018) (citation omitted). Because Congress alone "possess[es] the sole power of creating the tribunals (inferior to the Supreme Court)," it also has the exclusive power "of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good." *Palmore v. United States*, 411 U.S. 389, 401 (1973) (quoting *Cary v. Curtis*, 44 U.S. 236, 245 (1845)); *accord Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) ("Only Congress may determine a lower federal court's subject-matter jurisdiction." (citing U.S. Const. art. III, § 1)). Ultimately, when Congress limits federal jurisdiction, "it exercises a valid legislative power no less than when it lays taxes, coins money, declares war, or invokes any other power that the Constitution grants it." *Patchak*, 583 U.S. at 253. And "what the Congress gives, the Congress may take away." *Knapp*, 875 F.3d at 1128. Teva disputes none of this. So its concerns about hypothetical "lawlessness" being exempt "from judicial scrutiny," Pls.' Opp'n & Reply at 2-3—arguments that could be made in every case about preclusion of judicial review— would be more appropriately directed to Congress than to this Court. *See, e.g.*, *Knapp* 875 F.3d at 1129, 1131 (holding that "total preclusion" is not an "absurd" result, rejecting the concern that enforcing the text as written would mean that "blatant lawlessness would be unreviewable").

**b.** Once Teva gets around to addressing the central question on jurisdiction—that is, whether its statutory claims "fall[] 'within the preclusive scope' of the statute," *DCH Reg'l*, 925 F.3d at 506 (quoting *Knapp*, 875 F.3d at 1128)—its primary theory seems to be that 42 U.S.C. § 1320f-7, without saying so explicitly, "bars review only of specific 'selection' or 'determination' or 'calculation' decisions" involving individual drugs. Pls.' Opp'n & Reply 16. By contrast, on Teva's view, the subsidiary agency decisions along the way, even if they dictate those "specific 'selection' or 'determination' or 'calculation' decisions," *id.*, remain subject to litigation.

---

[3] For example, the Supreme Court has suggested that it would raise a "serious constitutional question" if a preclusion provision were read "to deny a judicial forum for constitutional claims." *Bowen*, 476 U.S. at 681 n.12. The government has not argued here (or in any of the other cases challenging this program) that 42 U.S.C. § 1320f-7 forecloses review of constitutional claims.

Plaintiffs are mistaken—both as a matter of statutory interpretation, and as a matter of D.C. Circuit precedent interpreting similar bars to judicial review.

Start with the text.  Teva is right that "a definition and a determination are not the same thing."  *Id.* at 8.  But that is no help to Teva where, as here, the precluded "determination[s]" *included* the agency defining key statutory terms.  *Id.*  In other words, the "definitional" challenge that Teva purports to bring is simply to one of the earlier steps in the agency's overall "determination of qualifying single source drugs," its "determination of negotiation-eligible drugs," and the ultimate "selection of drugs."  42 U.S.C. § 1320f-7(2).  But the plain text of the statute precludes review of that entire "determination"—not just the final step, in which CMS identifies each selected drug by name.  Put another way, in precluding review of the agency's "determination" of qualifying single source drugs and its "determination" of negotiation-eligible drugs, Congress shielded from review both the agency's identification of such drugs and "the process by which the [agency] reache[d] this decision."  *Bakran v. DHS*, 894 F.3d 557, 563 (3d Cir. 2018) (quoting *Determination*, Webster's Third New International Dictionary 616 (1993)).

Another textual problem for Teva is that the preclusion provision does not apply to "the selection of a drug," singular, but to "[t]he selection of drugs," plural.  42 U.S.C. § 1320f-7(2).  The same with CMS's "determination of qualifying single source drugs" and its "determination of negotiation-eligible drugs," which also use the plural "drugs."  *Id.*  So Teva's central submission— that it "has not asked the Court to direct CMS to reverse an individual decision governing any particular drug," singular, but rather that it challenges the way CMS defined "qualifying single source drugs" for *all* drugs, plural, Pls.' Opp'n at 13 (citations omitted)—leaves its claims equally precluded.  If Congress meant to preclude only challenges to the selection of "any particular drug," *id.*, then it is hard to see why the statute refers to "selection of drugs," plural.

As Defendants explained in their prior brief (at 12)—with no response from Plaintiffs— the D.C. Circuit has applied this reasoning to other Medicare preclusion provisions.  In *Texas Alliance for Home Care Services v. Sebelius*, the statute precluded review over "the awarding of contracts under this section."  681 F.3d 402, 409 (D.C. Cir. 2012).  The challengers argued that

this "statutory language was meant to preclude only review of 'individual contracts.'" *Id.* at 410 (quoting Appellants' Br. 18). The D.C. Circuit rejected that argument because, "by its terms," the statute "applie[d] not to the awarding of a single contract but to 'the awarding of contracts' generally." *Id.* So too here, for "[t]he selection of drugs," generally. 42 U.S.C. § 1320f-7(2).

**c.** Moving beyond the plain text of this particular preclusion provision, Teva faces another insurmountable problem: the D.C. Circuit has repeatedly interpreted other similar preclusion provisions in the Medicare statute in a manner that is inconsistent with Teva's approach. Although Teva struggles mightily to distinguish many of those cases in its brief, it cannot. In chronological order, this robust line of D.C. Circuit precedent speaks for itself:

*First*, in *Texas Alliance*, as discussed above in the context of Teva's singular-plural problem, the plaintiffs "challenge[d] a regulation addressing the 'applicable financial standards' that a . . . supplier must meet to be eligible for a Medicare contract." 681 F.3d at 404. The D.C. Circuit held that a challenge to the regulation was precluded, under a provision that barred review of "the awarding of contracts under this section." *Id.* at 409-11. The D.C. Circuit reasoned that "financial standards are indispensable to 'the awarding of contracts' as such standards determine whether or not a contract may be awarded to a bidder based on the financial documents submitted with its bid." *Id.* at 409-10.

*Second*, in *Florida Health Sciences Center, Inc. v. HHS*, 830 F.3d 515 (D.C. Cir. 2016), "[a]lthough the" preclusion provision at issue barred "judicial review of the Secretary's estimates," a hospital sought "to challenge the data underlying" those estimates. *Id.* at 517. The D.C. Circuit held "that the bar on judicial review of the Secretary's estimates precludes review of the underlying data as well." *Id.* In short, the hospital was "simply trying to undo the Secretary's estimate of the hospital's uncompensated care by recasting its challenge to the Secretary's choice of data as an attack on the general rules leading to her estimate." *Id.* at 522. It could not do so.

*Third*, in *Mercy Hospital, Inc. v. Azar*, 891 F.3d 1062, 1067 (D.C. Cir. 2018), plaintiffs challenged an agency calculation called the "LIP adjustment," which was related to a precluded determination called "the step-two rate." The D.C. Circuit explained that "[a]s both a textual and

a practical matter, the LIP adjustment is inextricably intertwined with the step-two rate, and so the shield that protects the step-two rate from review protects the LIP adjustment as well." *Id.*; *see also id.* ("Because reviewing a formula used by the prospective payment rate would effectively review the rate itself, we cannot review the former if we cannot review the latter.").

**Fourth**, in *Knapp*, the D.C. Circuit rejected the argument that, for preclusion purposes, "the 'process' is distinct from the CMS determination flowing from the process." 875 F.3d at 1129. The D.C. Circuit explained that it had twice "rejected the 'categorical distinction between inputs and outputs'" that the plaintiff advanced. *Knapp*, 875 F.3d at 1131 (quoting *Fla. Health*, 830 F.3d at 519). It did so again.

**Fifth**, in *DCH Regional*, the D.C. Circuit held that it "cannot review the Secretary's method of estimation without also reviewing the estimate. And because the two are inextricably intertwined," the Medicare Act "precludes review of both." 925 F.3d at 507. The plaintiff was "simply trying to undo the Secretary's estimate . . . by recasting its challenge to that estimate as an attack on the underlying methodology." *Id.* at 508. Again, the D.C. Circuit held that it could not.

In other words, Teva is hardly the first litigant to try a distinction between inputs to an agency process and the outputs of that process, or between an agency methodology and the results of that methodology, or between a general agency rule and the individual outcomes arising from application of that rule. But at least in the context of the Medicare statute, in the D.C. Circuit, those distinctions are untenable as a matter of binding precedent.[4]

Teva's primary response is that some of these cases involved "challenges to a shielded determination dressed up in general-rule garb." Pls.' Opp'n & Reply at 11. But that is no distinction at all—it is an apt description of Teva's own claims. Regardless, as the precedent above confirms, framing its challenge as targeting a "general rule" is no help anyway. To the contrary, these sorts of preclusion provisions (at least in the Medicare statute) are equally applicable to agency decisions that are "indispensable or integral to, or inextricably intertwined with, the

---

[4] The D.C. Circuit is not alone. *See, e.g.*, *Yale New Haven Hosp.*, 56 F.4th at 25; *Bakran*, 894 F.3d at 563; *John Balko & Assocs. v. Sec'y of HHS*, 555 F. App'x 188, 193 (3d Cir. 2014).

unreviewable agency action." *Fla. Health*, 830 F.3d at 519 (citation omitted); *accord DCH Reg'l*, 925 F.3d at 507 ("[B]ecause the two are inextricably intertwined, section 1395ww(r)(3)(A) precludes review of both."); *Mercy Hosp.*, 891 F.3d at 1067 ("As both a textual and a practical matter, the LIP adjustment is inextricably intertwined with the step-two rate, and so the shield that protects the step-two rate from review protects the LIP adjustment as well."); *Texas All.*, 681 F.3d at 411 ("Financial eligibility under the applicable standards, then, is inextricably intertwined with the bidding structure and review thereof is therefore expressly precluded.").

Applying that "inextricably intertwined" principle here, Teva cannot reasonably dispute that the agency's *definition* of a "qualifying single source drug" is "indispensable or integral to, or inextricably intertwined with," *Fla. Health*, 830 F.3d at 519 (citation omitted), the agency's "determination of qualifying single source drugs," as well as its "determination of negotiation-eligible drugs" and its "selection of drugs," 42 U.S.C. § 1320f-7(2).  Without a definition of "qualifying single source drug," there can be no "determination of qualifying single source drugs."

Next, like many of the unsuccessful Medicare-related, D.C. Circuit plaintiffs that came before it, "[t]o support its argument for jurisdiction, [Teva] invokes *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), and *ParkView Medical Associates v. Shalala*, 158 F.3d 146 (D.C. Cir. 1998)."  *DCH Reg'l*, 925 F.3d at 507; *see* Pls.' Opp'n & Reply at 13.  But as the D.C. Circuit has already explained, "[n]either case is apposite" here.  *DCH Reg'l*, 925 F.3d at 507.

*McNary* was an immigration case raising constitutional claims, in which the preclusion provision was worded quite differently: it "barred district-court review of any 'determination respecting *an application* for adjustment of status' of certain alien farmworkers."  *DCH Reg'l*, 925 F.3d at 507 (emphasis added) (quoting *McNary*, 498 U.S. at 486 n.6 (quoting 8 U.S.C. § 1160(e))).  The Supreme Court concluded that that statutory text—including (as italicized by the Supreme Court) its reference to "*an application*," singular—was about "a single act" and thus "describe[d] the denial of an individual application."  *McNary*, 498 U.S. at 492.

But here, the singular-plural issue cuts the other way, as discussed above.  *See supra* at 6-7 (citing *Texas All.*, 681 F.3d at 409).  In addition, in this case, the government's preclusion

9

argument (unlike in *McNary*) covers "only statutory claims, so [the Court] may apply the preclusion provision without straining to avoid the 'serious constitutional question' that would arise from denying judicial review of constitutional claims." *DCH Reg'l*, 925 F.3d at 508 (quoting *Bowen*, 476 U.S. at 681 n.12). So this Court should reject Plaintiffs' broad reading of *McNary* for essentially the same reasons that the D.C. Circuit did in *DCH Regional*.

Plaintiffs (at 8) also cite another immigration case, *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020), but that case relies heavily on *McNary* and thus is inapposite for many of the same reasons. In addition, the statutory text in *Grace* was materially different: it explicitly contemplated judicial review of "a regulation, or a written policy directive, written policy guideline, or written procedure" about credible-fear interviews. *Id.* at 891 (quoting 8 U.S.C. § 1252(e)(3)(A)(ii)). Given that statutory text, it is not surprising that the D.C. Circuit concluded that "facial challenges to the written policies" at issue were reviewable. *Id.* at 893. That sheds little light on the provision at issue here—if anything, it undermines Teva's theory, by confirming that Congress knows how to draw an explicit distinction between one-off agency decisions and a broader "written policy directive." 8 U.S.C. § 1252(e)(3)(A)(ii); *see, e.g.*, *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision.").

"*ParkView* is similarly inapplicable." *DCH Reg'l*, 925 F.3d at 508. Again like *McNary*, the preclusion provision at issue in that case was about "[t]he decision of the Secretary," in the singular. *ParkView*, 158 F.3d at 148 (citation omitted). Regardless, "*ParkView* has been twice limited" by subsequent decisions of the D.C. Circuit. *DCH Reg'l*, 925 F.3d at 508. It is now clear that a plaintiff cannot "recast its challenge" to a precluded agency determination "as an attack on the underlying methodology" that led to that determination. *Id.*; *see also Fla. Health*, 830 F.3d at 521-22 (distinguishing *ParkView* on similar grounds); *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 405 (D.C. Cir. 2005) (same).

**d.**  At times, Teva now goes so far as to try and disclaim any interest in the selection of its drug (or its competitors' drugs) in particular, even asserting that "[i]t is unclear what the final list

of selected drugs might have looked like had CMS properly applied the statutory criteria." Pls.'
Opp'n & Reply at 14. It also emphasizes that "Teva filed this lawsuit before its innovator drugs,
AUSTEDO and AUSTEDO XR, were even selected for negotiation." *Id.* at 7. The factual
premises of some of these arguments are dubious but, regardless, they are no help to Teva here.
As the D.C. Circuit has warned in precisely this context, "[d]esigning a pleading so that it
circumvents a statutory bar to review will not override Congress's decision to deny jurisdiction."
*Mercy Hosp.*, 891 F.3d at 1067. And for the reasons that follow, at bottom, these claims are—and
only could be—a challenge to CMS's "selection of drugs," its "determination of negotiation-
eligible drugs," and its "determination of qualifying single source drugs." 42 U.S.C. § 1320f-7(2).

Although it is true that "Teva filed this lawsuit"—though not the operative complaint—
two days before Austedo was selected, it surely did so because it *expected* that Austedo was going
to be selected imminently, based on the clear statutory criteria in 42 U.S.C. § 1320f-1.[5] The
original complaint straightforwardly alleged, at some length, that both Austedo and Austedo XR
were "eligible to be selected for inclusion" in the Negotiation Program under CMS's guidance,
and that "[i]f AUSTEDO and AUSTEDO XR are selected . . . , Teva's revenue for those drugs
will be lower." Compl. ¶¶ 92-93, ECF No. 1; *see also id.* ¶¶ 86-93. The amended complaint uses
the word "Austedo" 38 times—mostly in the context of its allegedly improper selection for the
Negotiation Program.[6] These allegations about the selection of Teva's drug confirm what is
obvious from Teva's legal arguments: this suit (at a bare minimum) "involves CMS's decisions

---

[5] The original complaint was filed on January 15, 2025. The selection of drugs for Initial
Price Applicability Year 2027 was announced on January 17, 2025. *See* CMS, *HHS Announces
15 Additional Drugs Selected for Medicare Drug Price Negotiations in Continued Effort to Lower
Prescription Drug Costs for Seniors* (Jan. 17, 2025), https://perma.cc/X9QG-YKZK. Teva's
amended complaint (now the operative complaint) was filed on February 10, 2025.

[6] *See, e.g.,* Am. Compl. ¶ 93 ("On January 17, 2025, HHS announced that AUSTEDO and
AUSTEDO XR were selected for inclusion in the DPNP for 'negotiations' in 2025."); *id.*
("AUSTEDO XR was eligible for selection only because of CMS's definition of a Qualifying
Single Source Drug."); *id.* ¶ 94 ("Because AUSTEDO and AUSTEDO XR were selected for
inclusion in the DPNP, Teva's revenue for those drugs will be lower."); *id.* ¶ 199 ("Because
AUSTEDO and AUSTEDO XR were selected for the DPNP, the IRA strips Teva of any ability to
meaningfully negotiate a reasonable price for those products.").

about *which drugs* are subject to the program." Pls.' Opp'n & Reply at 7. The complaint thus fails even Teva's own test about how this Court should interpret the preclusion provision.

To be clear, Teva's allegations about Austedo are not just tangential rhetoric—they are load bearing, and there for a reason. If Teva had sought an advisory opinion about the legality of CMS's guidance in the abstract—without seeking to remedy some concrete interest of Teva in particular—the case would be dismissed for lack of Article III standing. We know this because another manufacturer, AstraZeneca, actually tried it. In *AstraZeneca*, both the district court and a unanimous Third Circuit panel had no trouble concluding that AstraZeneca's statutory claims— bringing an abstract challenge to CMS's guidance, which had not affected the selection of any AstraZeneca drug—had to be dismissed for lack of standing. *AstraZeneca*, 137 F.4th at 125-26.

Plaintiffs try to turn this problem around on the government, referencing *AstraZeneca*, noting that "the government has elsewhere argued that manufacturers lack standing to raise a facial definitional claim when the challenged aspects of CMS's Guidance 'had no bearing on [the drug's] selection for negotiation.'" Pls.' Opp'n & Reply at 14 (alteration in original) (quoting Br. for Appellees at 30, *AstraZeneca Pharms. LP v. HHS*, No. 24-1819, 2024 WL 5219932 (3d Cir. Sept. 12, 2024)). But the government was correct to raise that argument, as both the district court and the Third Circuit agreed. Plaintiffs describe this as the government "trying to have its cake and eat it too," *id.* at 15, but that is not an argument, it is a turn of phrase—and one that only works if you start from the premise that there must always be some way to sue in federal court over every agency action. That assumption is erroneous. *See, e.g.*, *Knapp*, 875 F.3d at 1128.

Ultimately, this argument boils down to a plea that this Court ignore plain statutory text to achieve a policy result that drug manufacturers prefer, as Plaintiffs purport to be incredulous that Congress could have meant what it said: that it will generally be up to CMS "to police its own conduct" on these issues, rather than federal courts. *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (cited in Pls.' Opp'n & Reply at 5-6, 15). But that is what Congress wanted, as confirmed by the statutory text—at least with respect to CMS's "selection of drugs," its "determination of negotiation-eligible drugs," and its "determination of qualifying single source

drugs." 42 U.S.C. § 1320f-7(2).  The D.C. Circuit has repeatedly enforced similar provisions in the Medicare statute as written.  This Court should do the same.[7]

e.  Finally, Plaintiffs' opposition (at 15-17) briefly marches through the elements of an *ultra vires* claim, again in hopes of persuading this Court to disregard Congress's choice to preclude judicial review.  But *ultra vires* review "is intended to be of extremely limited scope." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1262 (D.C. Cir. 2020) (citation omitted).  In other words, as then-Judge Kavanaugh once put it, it is the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  This case is no exception.

As Plaintiffs acknowledge (at 16), an *ultra vires* claim may proceed in the D.C. Circuit "only when three requirements are met: '(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'"  *DCH Reg'l*, 925 F.3d at 509 (quoting *Nyunt*, 589 F.3d at 449); *accord* Pls.' Opp'n & Reply at 16.  Plaintiffs cannot satisfy the first or third requirements.

On the first, Plaintiffs hardly even try to demonstrate that "the statutory preclusion of review is implied rather than express."  *Id.*  That is not surprising, as Congress provided explicitly that "[t]here shall be no administrative or judicial review" of the relevant agency actions.  42 U.S.C. § 1320f-7.  It is hard to be more "express" than that.

Plaintiffs do respond (in one conclusory sentence) that "the judicial-review bar does not expressly prohibit review of challenges to CMS's Guidance" but instead applies only to "specific 'selection' or 'determination' or 'calculation' decisions, none of which Teva challenges."  Pls.'

---

[7] The Pharmaceutical Research and Manufacturers of America (PhRMA)—a leading trade association for pharmaceutical manufacturers—apparently disagrees with Teva's interpretation of 42 U.S.C. § 1320f-7.  As part of a (meritless) nondelegation claim, PhRMA recently asserted in other litigation that "the IRA's judicial review bar purports to preclude" agency decisions of "statutory interpretation."  *See* Pls.' Reply in Supp. of Mot. for Summ. J. & Opp'n to Defs.' Mot. for Summ. J. at 8, ECF No. 85, *NICA v. Kennedy*, No. 1:23-cv-707 (W.D. Tex. May 27, 2025).

Opp'n & Reply at 16. As discussed above at length, that is wrong. *See supra* at 5-9. But even if it were correct, it would not change the fact that the preclusion provision in the statute is an "express" one, which is the relevant question in considering the potential availability of an *ultra vires* claim. As Judge Friedrich put it in rejecting a similar argument, "Plaintiffs' insistence that the preclusive bar must describe in detail their particular challenge in order to be considered express is incorrect." *Ascension Borgess Hosp. v. Becerra*, 557 F. Supp. 3d 122, 135-36 (D.D.C. 2021), *aff'd*, 61 F.4th 999 (D.C. Cir. 2023); *accord DCH Reg'l*, 925 F.3d at 509 (rejecting an *ultra vires* claim because "the bar on judicial review is express," without any more granular analysis); *Yale New Haven Hosp.*, 56 F.4th at 27 (same).

In addition, if Plaintiffs were correct about the scope of the preclusion provision, then there would be no need (and thus no basis) for an *ultra vires* claim anyway—Plaintiffs could simply proceed with a routine statutory-authority challenge under the Administrative Procedure Act (APA). It is only because Plaintiffs *cannot* bring such a claim, due to the "express" preclusion provision in 42 U.S.C. § 1320f-7, that the parties are addressing the *ultra vires* doctrine at all. So tacking on the phrase "*ultra vires*" to Plaintiffs' other preclusion arguments gets them nowhere. *Cf., e.g.*, *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 201 (D.D.C. 2024) ("[I]f a plaintiff advances both a well-pleaded APA claim and a duplicative ultra vires claim, the ultra vires claim must be dismissed."); *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017) (similar).

In any event, Plaintiffs' *ultra vires* theory also fails straightforwardly under the third requirement, which is "especially demanding." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). There, "[o]nly error that is patently a misconstruction of the [statute], that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Id.* (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022)). This doctrine is thus reserved for the most "extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Fed.*

*Express Corp.*, 39 F.4th at 764. "Said another way, garden-variety errors of law or fact are not enough." *Id.* (cleaned up).

Teva falls far short of the "nearly insurmountable" showing necessary. *U.S. Dep't of Just. v. Fed. Lab. Rels. Auth.*, 981 F.2d 1339, 1343 (D.C. Cir. 1993). Plaintiffs do nothing more than halfheartedly incorporate by reference their merits arguments about the definition of a "qualifying single source drug," asserting without explanation that CMS's actions have "chang[ed] the text to mean something different." Pls.' Opp'n & Reply at 16-17. But even if Teva had the better of that argument, *but see infra*, Section II, that would still just be a "garden-variety error[]" of statutory interpretation, which is not enough. *Fed. Express*, 39 F.4th at 764. Teva must "'show *more* than the type of routine error in statutory interpretation' that suffices under normal APA review." *Amazon Servs. LLC v. Dep't of Agric.*, 109 F.4th 573, 580 (D.C. Cir. 2024) (emphasis added) (quoting *Fed. Express*, 39 F.4th at 765). Because it cannot, *ultra vires* review is unavailable.[8]

## II.  PLAINTIFFS' STATUTORY CLAIMS LACK MERIT.

Teva is correct that "no court has yet addressed" either of its statutory-interpretation theories "on the merits," Pls.' Opp'n & Reply at 2—though that is only because the plaintiffs in *AstraZeneca* lacked Article III standing, *see* 137 F.4th at 125-26, and because the district court in *Novo Nordisk* applied the statute's preclusion provision to materially identical claims, *see* 2024 WL 3594413, at *3. Nevertheless, if this Court does become the first to address the merits of Teva's statutory-authority claims, it should hold that both are meritless. In short, CMS properly defined "qualifying single source drug" to include all "dosage forms and strengths" of a drug with

---

[8] Plaintiffs also pluck some quotations from *National Association of Postal Supervisors v. U.S. Postal Service*, 26 F.4th 960, 970-71 (D.C. Cir. 2022), some of which might be read to suggest that "courts generally have jurisdiction to grant relief" any time "the agency has violated the law." Pls.' Opp'n & Reply at 15-16 (citation omitted). That case relies heavily on prior, older D.C. Circuit precedent that is specific to the statutes creating the U.S. Postal Service. *See Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 970-71 (explaining that the D.C. Circuit had already issued an opinion "[m]any years ago" about "the Postal Act" that "controls in this case"). In any event, as the D.C. Circuit has stated repeatedly, both before and after that decision, "garden-variety errors of law or fact are not enough" to support an *ultra vires* claim. *Fed. Express*, 39 F.4th at 764. Plaintiffs ultimately seem to acknowledge this heightened standard, eventually citing the correct legal test from *DCH Regional*, 925 F.3d at 509. *See* Pls.' Opp'n & Reply at 16.

the same active moiety, consistent with the IRA's plain language. CMS, *Medicare Drug Price Negotiation Program: Final Guidance* at 167 (Oct. 2, 2024), https://perma.cc/J6JE-HHRS (2027 Guidance). CMS also appropriately concluded that a generic drug or biosimilar "is . . . marketed" for the purposes of the IRA, 42 U.S.C. § 1320f-1(e)(1)(A)(iii), (B)(iii), "when the totality of the circumstances . . . reveals that the manufacturer of that drug or product is engaging in bona fide marketing of that drug or product." 2027 Guidance at 279.

> **A.    CMS appropriately considered different forms of the same drug in the negotiation process, as required by the IRA.**

CMS's 2027 Guidance explains its intent to consider all "dosage forms and strengths" of a drug with the same active moiety and the same holder of a new drug application (NDA), *see* 2027 Guidance at 167, consistent with the IRA's plain language directing CMS to consider all the different "dosage forms," "strengths," and "formulations" of the drug, 42 U.S.C. § 1320f-1(d)(3)(B); 42 U.S.C. § 1320f-5(a)(2), and all "applications and approvals" of a drug, 42 U.S.C. § 1320f-3(e)(1)(D).[9] By contrast, Teva's interpretation of "qualifying single source drug" would require CMS to consider all "dosage forms and strengths" of a drug, *except* when the different dosage form or strength was approved under a different NDA. *See* Pls.' Opp'n & Reply at 17. There is no basis for Teva's atextual gloss on the statute.[10]

> **a.    Teva's interpretation is contrary to the plain language of the IRA.** The IRA nowhere specifies that aggregation of all the different "dosage forms," "strengths," "formulations," and "applications and approvals" of the drug must be limited to the *same* application. 42 U.S.C. § 1320f-1(d)(3)(B); 42 U.S.C. § 1320f-5(a)(2); 42 U.S.C. § 1320f-3(e)(1)(D). Indeed, had Congress intended CMS to consider only those drug products approved under a single NDA or

---

[9] Similarly, for biologics, the 2027 Guidance explains that a "qualifying single source drug" includes "all dosage forms and strengths" of a biologic with the same active ingredient and the same holder of a biologics license application (BLA). 2027 Guidance at 168.

[10] Teva now clarifies that its interpretation is not "product-specific," as it previously suggested, Mem. in Supp. of Teva's Mot. for Summ. J. ("Pls.' Mot.") at 22, ECF No. 15-1, but rather "NDA-specific," Pls.' Opp'n & Reply at 17; *see also* Defs.' Br. at 18 n.7 (noting this ambiguity).

BLA, it could have said so far more easily than explicitly directing CMS to consider all the different "dosage forms," "strengths," and "formulations" of the drug, 42 U.S.C. § 1320f-1(d)(3)(B); 42 U.S.C. § 1320f-5(a)(2), and all "applications and approvals" of the drug, 42 U.S.C. § 1320f-3(e)(1)(D).[11]

Teva's interpretation of 42 U.S.C. § 1320f-3(e)(1)(D) is particularly forced. That provision directs CMS to consider all "applications and approvals under section 355(c) of Title 21 or section 262(a) of [Title 42] for the drug" when determining how much to offer in negotiations. 42 U.S.C. § 1320f-3(e)(1)(D). Teva asserts that both of the cross-referenced sections—21 U.S.C. § 355(c) and 42 U.S.C. § 262(a)—"also encompass [procedures related to] supplements to an original NDA or BLA." Pls.' Opp'n & Reply at 19. Plaintiffs argue that there is thus "no reason" to read Section 1320f-3(e)(1)(D) as referring to multiple NDAs or BLAs, rather than to multiple supplements within a single NDA or BLA. *See id.*

Plaintiffs' argument proves too much. The cross-referenced sections "encompass" procedures related to supplemental applications because these sections provide procedures related to the base-level approval process for *all* applications—including both new NDAs or BLAs and supplemental NDAs or BLAs. *See* 21 U.S.C. § 355(c); 42 U.S.C. § 262(a); *see also, e.g.*, 21 C.F.R. § 314.3 (defining "[a]pplication, new drug application, or NDA" as "the application" plus "all amendments and supplements to the application").[12] It would make little sense for Congress to

---

[11] The Congressional Budget Office (CBO) is also aligned on CMS's approach, as outlined in its letter to the U.S. House Committee on the Budget. *See* Defs.' Br. at 22 n.8. Contrary to Teva's suggestion that this CBO letter merely repeated CMS's practice thus far, *see* Pls.' Opp'n & Reply at 25, CBO explicitly noted that "decisions made by [CMS] have been largely consistent with" CBO's "expectations about how the [IRA] will be implemented," including CBO's "expectation that CMS will negotiate drug prices on the basis of a drug's active ingredient instead of its trade name or approval date." *See* Letter from Phillip L. Swagel, Dir., Cong. Budget Off. to Hon. Jodey Arrington, Chairman, Comm. on the Budget, U.S. House of Reps., and to Hon. Michael C. Burgess, U.S. House of Reps at 3 (Dec. 21, 2023), https://perma.cc/9A9B-6SM6.

[12] For example, Section 355(c) addresses the timing for approval or hearing on an application, *see* 21 U.S.C. § 355(c)(1); instructs an applicant to submit the relevant patent information to the FDA, *see id.* § 355(c)(2); provides the effective date of approval for certain NDAs, including in case of a patent-infringement lawsuit, *see id.* § 355(c)(3); and allows

cross-reference the approval processes used for all applications, including new NDAs and BLAs, if Congress had meant to cabin CMS to considering only applications and approvals within a single NDA or BLA. Had Congress so intended, Congress easily could have specified. *See Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply . . . .").

Moreover, Teva's argument that a "qualifying single source drug" can have only one NDA or BLA is counterintuitive at best, given that the number of NDAs or BLAs for a drug or biologic may be affected by a variety of factors, including FDCA provisions, FDA regulations, and FDA guidance, as well as how an applicant chooses to submit its application(s) to FDA. In some cases, a drug or biologic with multiple dosage forms and strengths may have been approved in a single NDA or BLA, but that is often not the case. A manufacturer may decide to submit multiple applications for a drug with the same active moiety, such as a drug with both an immediate release and an extended-release formulation. *See* 2027 Guidance at 169 ("CMS is aware that existing NDA / BLA holders have obtained approval for new dosage forms or different routes of administration of the same active moiety / active ingredient under different NDAs or BLAs.").[13]

---

applicants to rely on drugs manufactured in "a pilot or other small facility" to show the safety and effectiveness of the drugs and obtain approval for the drugs before their manufacture in a larger facility, *see id.* § 355(c)(4). Section 355(c)(5)—which Plaintiffs cite as evidence that § 355(c) "encompass[es] supplements," Pls.' Opp'n & Reply at 19—does specifically refer to supplemental applications, but it merely provides that applicants for supplemental NDAs may rely on "qualified data summaries," 21 U.S.C. § 355(c)(5)(A).

[13] It is precisely these circumstances that allow for the possibility of "product-hopping," *see* 2027 Guidance at 13, which is a strategy to fend off generic competition by introducing inconsequential changes to an existing drug and shifting patients to that new version, *see* Defs.' Br. at 3-4. Teva's suggestion that FDA can "prevent" product-hopping by simply "refus[ing] to accept or . . . reclassify[ing] an NDA that it believes should have been filed as a supplement," Pls.' Opp'n & Reply at 26-27, is misplaced, as FDA's authority to "reclassify" such submissions is limited by statutory and regulatory provisions, Agency guidance, and other internal procedural documents, *see, e.g.*, 21 U.S.C. § 355(b)(4)(A), 21 C.F.R. § 314.70(h). For example, some of these procedural documents expressly consider the applicant's marketing plans in submission classifications. *See, e.g.*, Center for Drug Evaluation and Research, *Manual of Policies & Procedures* § 5018.2, "NDA Classification Codes," (December 8, 2022), https://www.fda.gov/media/94381/download. Teva's reliance on *Mallinckrodt ARD LLC v.*

Indeed, Teva submitted two separate applications for Austedo and its "extended-release formulation," Austedo XR. Am. Compl. ¶ 89. Austedo and Austedo XR are different "dosage forms" of the same deutetrabenazine drug, produced by the same manufacturer. 42 U.S.C. § 1320f-1(d)(3)(B); *id.* § 1320f-5(a)(2). Austedo and Austedo XR, in Teva's words, "contain[] the same active ingredient," are "therapeutically equivalent," and differ in that Austedo is taken twice a day and Austedo XR is taken once a day.[14] Congress plainly instructed CMS to aggregate data across all "dosage forms . . . of the drug, including . . . an extended release formulation" like Austedo XR. 42 U.S.C. § 1320f-1(d)(3)(B).

**b.** To criticize CMS's interpretation, Teva strains to construct a problem related to the requirement that a qualifying single source drug consists only of products held by "the same holder of a[n] NDA." 2027 Guidance at 167. Teva's argument is that CMS's definition is illogical without this "same holder" (or "same entity") qualifier, because it would sweep in products held by different entities; yet, argues Teva, the "same holder" qualifier itself lacks statutory authority. *See* Pls.' Opp'n & Reply at 20-21.

Teva is mistaken, because the "same holder" limitation also follows from the IRA's text. In particular, the statute repeatedly and consistently directs CMS to negotiate with "the manufacturer" of the selected drug, in the singular. As relevant here, the IRA defines

---

*Verma*, 444 F. Supp. 3d 150 (D.D.C. 2020), for the proposition that FDA can "properly [re]classify an application as a supplement rather than a distinct NDA when circumstances so warrant," Pls.' Opp'n & Reply at 24, is also misplaced. That case did not involve FDA's reclassification of an improperly submitted application. Rather, that case involved a drug manufacturer attempting to circumvent the Medicaid Drug Rebate Program by taking advantage of FDA's NDA-assignment process—in particular, by using a temporary, administrative NDA number (assigned only for tracking purposes) to lead CMS to believe that a new indication for an existing drug was instead for an entirely new drug product. *See id.* at 173-77. The court explicitly noted that the Medicaid Drug Rebate Program should be interpreted so as to avoid "empower[ing]" "drug manufacturers to circumvent Congress's intent to reduce Medicaid spending via drug rebates by simply manipulating how a submitted drug application was administratively categorized." *Id.* at 173. The same is true here.

[14] *See* Teva, AUSTEDO® XR (deutetrabenazine) Extended-Release Tablets, New Once-Daily Formulation of AUSTEDO®, Now Available in the U.S. (May 15, 2023), https://www.tevapharm.com/news-and-media/latest-news/austedo-xr-deutetrabenazine-extended-release-tablets-new-once-daily-formulation-of-austedo-now-avai/.

"manufacturer" as "the manufacturer" "with respect to a drug or biological." 42 U.S.C. § 1320f(c)(1); *id.* § 1395w-3a(c)(6)(A)).[15]  And the IRA directs CMS to negotiate with "the manufacturer" to reach "a maximum fair price for such selected drug of the manufacturer." *Id.* § 1320f-2(a)(1).  After entering into an agreement to negotiate, "the manufacturer" must submit certain information to CMS.  *See id.* § 1320f-2(a)(4)(A) (directing "the manufacturer" to submit "information on the non-Federal average manufacturer price . . . for the drug" (citing 38 U.S.C. § 8126(h)(5))); *see also* 38 U.S.C. § 8126(h)(5) (defining "non-Federal average manufacturer price" as "the weighted average price of a single form and dosage unit of the drug that is paid by wholesalers in the United States to *the manufacturer*" (emphasis added)); 42 U.S.C. § 1320f-3(c)(1)(A), (C) (directing CMS to use "average non-Federal average manufacturer price" for determining ceiling on maximum fair price).  And the IRA directs CMS to provide an initial offer to "the manufacturer of the selected drug." 42 U.S.C. § 1320f-3(b)(2)(B).[16]

Because the IRA directs CMS to negotiate a maximum fair price with "the manufacturer" of the selected drug, in the singular, *see* 2027 Guidance at 187, CMS recognizes that different dosage forms and strengths of a drug with the same active moiety (or active ingredient) are the same qualifying single source drug only when the NDA(s) or BLA(s) are held by the same manufacturer, *see id.* at 167.  CMS's inclusion of the "same holder" qualifier in the definition of a qualifying single source drug is thus explicitly contemplated by the text of the statute.[17]

---

[15]  Section 1395w-3a(c)(6)(A) further cross-references the definition of "manufacturer" in 42 U.S.C. § 1396r-8(k)(5), which defines "manufacturer" as "any entity which is engaged in" either (1) "the production, preparation, propagation, compounding, conversion, or processing of prescription drug products," or (2) "the packaging, repackaging, labeling, relabeling, or distribution of prescription drug products."

[16]  There are more examples.  *See, e.g.*, 42 U.S.C. § 1320f(b)(4)(A)(i) (defining "negotiation period" as beginning on, as one alternative, "the date on which *the manufacturer of the drug* and the Secretary enter into an agreement . . . with respect to such drug" (emphasis added)); *id.* § 1320f-1(d)(2)(B)(ii) ("A drug shall not be considered to be a qualifying single source drug . . . if *the manufacturer of such drug* is acquired after 2021 by another manufacturer that does not meet the definition of a specified manufacturer . . . ." (emphasis added)).

[17]  Teva also asserts in passing that the IRA provides no statutory authority to support CMS's ability "to 'investigate' whether NDAs and BLAs 'are held by the same entity.'"  Pls.'

In any event, Teva cannot complain that CMS's interpretation is improper based on the "same holder" qualifier because the need for that qualifier also applies to Teva's interpretation. As CMS explains, multiple entities may meet the statutory definition of a "manufacturer," 42 U.S.C. § 1320f-2(a)(4)(A), for a single NDA or BLA, *see* 2027 Guidance at 187; *see also* n.15 (defining "manufacturer").[18]   Thus, even under Teva's "NDA-specific" interpretation of a qualifying single source drug, Pls.' Opp'n & Reply at 23, there might otherwise be multiple different entities that meet the definition of "manufacturer."  And given that the IRA directs CMS to negotiate with "the manufacturer" of a drug, *see supra* at 19-20, CMS has explained that in such circumstances, CMS will enter into agreements and negotiations with the *holder* of the relevant NDA(s) or BLA(s) (also known as the "Primary Manufacturer").  2027 Guidance at 187 (quoting 42 U.S.C. § 1320f-2(a)(1)).  So even Teva's interpretation of the statute would require a "same holder" qualifier to ensure consistency with the IRA's plain text.

Nevertheless, Teva protests that the "same holder" qualifier is illogical because it means that an entity could "escape[]" having its drug selected by "transferr[ing] ownership of one NDA to a subsidiary or another entity."  Pls.' Opp'n & Reply at 26.  But this is a recognized feature of

---

Opp'n & Reply at 21 (quoting 2027 Guidance at 15-16, 167-68).  But CMS has explained that it undertakes such "investigations" only in "rare circumstances" where "NDAs and BLAs with the same active moiety or active ingredient that appeared to be held by the same entity had non-identical names reported for the NDA holder or BLA holder due to inconsistencies in manufacturer reporting to FDA, such as typos or unstandardized use of abbreviations in the NDA or BLA holder name, and situations where it appears the NDA or BLA holder name has not yet been updated." 2027 Guidance at 15-16.  CMS further explained that it will conduct such investigations using public FDA sources and other public sources as appropriate.  *See id.* at 167-68.  Teva fails to explain how CMS exceeds its statutory authority by confirming the proper manufacturer in cases of typos, unstandardized abbreviations, or outdated information.

[18]  Multiple entities may meet the statutory definition of "manufacturer" where, for example, multiple manufacturers have entered into royalty, licensing, revenue-sharing, marketing, supply, purchasing, or affiliate agreements for a particular NDA or BLA.  2027 Guidance at 187. In such cases, CMS refers to the entity that holds the NDA or BLA as the "Primary Manufacturer." *Id*.  CMS uses the term "Secondary Manufacturer" for any other entity that also meets the statutory definition of "manufacturer" *and* "either (1) is listed as a manufacturer in an NDA or BLA for the selected drug; or (2) markets the selected drug pursuant to an agreement with the Primary Manufacturer."  *Id*.  There is only ever one Primary Manufacturer.

the IRA—and one that Teva hardly is positioned to complain about, as it works to manufacturers' benefit. Indeed, CMS has explicitly acknowledged the possibility that a manufacturer may transfer ownership of one or more NDAs or BLAs to another entity. *See, e.g.*, 2027 Guidance at 236 (providing guidance where a manufacturer "transfers ownership of one or more NDAs / BLAs of the selected drug to another entity" *after* entering into an agreement with CMS). Under Teva's hypothetical, if a manufacturer "transfer[s] ownership of one NDA to . . . another entity" prior to selection, and if such transfer ultimately means that the transferring manufacturer no longer manufactures a qualifying single source drug that is ranked among those with the 15 highest total expenditures, then that drug will simply not be selected. *See* 2027 Guidance at 167, 174, 179.[19]

**c.** Teva eventually falls back on the IRA's cross-references to the FDCA. But Teva overreads these cross-references. The definition of a qualifying single source drug includes "approv[al] under section 355(c) of Title 21" because, unsurprisingly, a qualifying single source drug must be FDA-approved. 42 U.S.C. § 1320f-1(e)(1)(A). Similarly, the IRA's cross-reference to the definition of a "covered part D drug" in section 1395w-102(e) ensures that a qualifying single source drug is a drug eligible for reimbursement under Medicare Part D. The definition of a "covered part D drug," in turn, cross-references the general Medicaid definition of a "covered outpatient drug" in section 1396r-8(k)(2), which—again—unsurprisingly requires that a drug be FDA-approved to be eligible for Medicaid reimbursement. These provisions do not mean that FDA approval creates a distinct, *new* "covered outpatient drug."[20] Regardless, is it unlikely that

---

[19] CMS has also recognized that the effect of a "transfer" of one or more NDAs or BLAs from one entity to another entity may in part "depend on whether the transfer . . . was made to an entity that is not a related party." 2027 Guidance at 236; *see also* 42 U.S.C. § 1320f-1(d)(2)(B)(i) (treating all persons considered to be "a single employer under [28 U.S.C. § 52(a) and (b)] of the Internal Revenue Code of 1986" as the same "manufacturer").

[20] Teva attempts to diminish language from *Ipsen Biopharmaceuticals, Inc. v. Azar*, No. 1:16-cv-02372, 2020 WL 3402344, at *10 (D.D.C. June 19, 2020), as "speculat[ion]." Pls.' Opp'n & Reply at 24. But Teva cannot escape that the court explicitly stated that a new NDA is "*not always sufficient*" to establish a new "covered outpatient drug" for Medicaid rebate purposes. *Ipsen*, 2020 WL 3402344, at *10 (citation omitted). The court in *Ipsen* also explicitly noted that "[t]he Medicaid Act does not adopt the entire FDCA wholesale." *Id.* at *9.

Congress would have buried a critical feature of the IRA beneath multiple layers of obscure cross-references to another statute with different purposes. Had Congress intended that a qualifying single source drug be NDA-specific, it could have just said so. *See Jama*, 543 U.S. at 341.

The Fourth Circuit recently came to a similar conclusion in an adjacent context. In *Vanda Pharmaceuticals, Inc. v. CMS*, the Fourth Circuit determined that "line extension" drugs—which are subject to additional rebates under the Medicaid Drug Rebate Program—are not limited to new formulations of drugs marketed and approved pursuant to supplemental NDAs, but instead also include drugs marketed and approved under new NDAs. 98 F.4th 483, 495-96 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1047 (2025). In doing so, the Fourth Circuit held that cross-references to the FDA approval process in definitions of the Medicaid Drug Rebate Program were meant only to limit Medicaid drug coverage to drugs that the FDA considers safe and efficacious—not to create a hidden, implicit constraint on line extensions. *See id*. ("If Congress had meant to limit line extensions to drugs approved via supplemental [NDAs], we think it would have done so explicitly within the definition of the term 'line extension.'"). Much the same could be said here.

**B.     CMS's bona fide marketing standard is consistent with the statutory text.**

CMS's Guidance explains that a generic drug or biosimilar "is . . . marketed" for purposes of the IRA's drug-selection provisions, 42 U.S.C. § 1320f-1(e)(1)(A)(iii), (B)(iii), "when the totality of the circumstances . . . reveals that the manufacturer of that drug or product is engaging in *bona fide* marketing of that drug or product." 2027 Guidance at 279 (emphasis added). That is a small ask; CMS's common-sense interpretation ensures only that a selected drug or biologic is subject to some amount of "meaningful competition" before it is removed from the Negotiation Program. *Id.* at 20. This requirement thus addresses circumstances in which a brand-name manufacturer enters a "market-limiting agreement" with a generic (or biosimilar) manufacturer, by which the generic manufacturer "agrees to limit production or distribution of the generic drug, such that only a nominal quantity of product is allowed to enter the market." *Id*. In resisting that interpretation, Teva tries to create a massive loophole in the statute, in which even bad-faith, sham

marketing of a generic would be enough to get a brand-name manufacturer out of the program. But all Teva's arguments lack merit.

    **a.** On its face, the phrase "is marketed" suggests actual and ongoing commercial activity— not a mere token presence. 42 U.S.C. § 1320f-1(c)(1)(B); *see also id.* § 1320f-1(e)(1)(A)(iii), (B)(iii). Even Teva's own cited dictionary definitions of the term "marketed," *see* Pls.' Mot. at 28; Defs.' Br. at 29, are consistent with an inquiry into whether a drug was "made available for sale," Pls.' Mot. at 28, in a "meaningful" way, *see* 2027 Guidance at 20. Teva's interpretation of "marketed," however, necessarily encompasses even one single, sham transaction that is never again replicated. It cannot be true that Congress enacted such a "self-defeating statute," *Pugin v. Garland*, 599 U.S. 600, 607 (2023) (citation omitted), by which a manufacturer could evade selection by entering into "market-limiting agreement[s]," 2027 Guidance at 20, or other bad-faith tactics to thwart congressional intent, *see* Defs.' Br. at 27.

    This is especially so given Congress's express delegation of authority to CMS to "determine[]," through unspecified procedures, whether a generic drug "is marketed." 42 U.S.C. § 1320f-1(c)(1)(B). As Defendants have explained, this language necessarily contemplates some level of agency discretion in applying the statutory standard. *See* Defs.' Br. at 24-25. Courts must "give effect, if possible, to every clause and word of a statute." *Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)).

    Teva bends over backwards to read the word "determine" out of the IRA. First, Teva argues that use of the word "determine" must be irrelevant because it appears inconsistently in the statute. *See* Pls.' Opp'n & Reply at 29. In particular, the IRA uses "determine" in connection with the phrase "is marketed" in § 1320f-1(c)(1)(B) and not in connection with the phrase "is . . . marketed" in § 1320f-1(e)(1)(A)(iii) and (B)(iii). But "[i]n all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning," so courts "avoid interpretations that would 'attribute different meanings to the same phrase.'" *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019) (quoting *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 329 (2000)). And the phrase "is marketed" is used in the same context in both sections:

whether a generic is marketed for the purpose of determining whether the listed drug is eligible for selection. Moreover, it is hardly surprising that Congress used the word "determine" the first time it referenced "market[ing]" chronologically in 42 U.S.C. § 1320f-1, but not the second time.

Teva next suggests that the word "determine" grants discretion only when used alongside "phrase[s]" that are "inherently ambiguous." Pls.' Opp'n & Reply at 30. But the D.C. Circuit has explicitly and repeatedly explained that the phrase "as determined by the Secretary," standing alone, is itself "an express delegation of authority." *Transitional Hosps. Corp. of La. v. Shalala*, 222 F.3d 1019, 1025 (D.C. Cir. 2000) (citations omitted); *see also Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 770 (D.C. Cir. 2019) (holding phrase "as determined by the Secretary" in Medicaid Act is an "express" delegation of authority); *Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 693 (5th Cir. 2020) ("Section 1396r-4(g)(1)(A) expressly delegates gap-filling authority to the Secretary through the 'as determined by the Secretary' clause." (citation omitted)); *San Bernardino Mountains Cmty. Hosp. Dist. v. HHS*, 63 F.3d 882, 886 (9th Cir. 1995) (holding statute delegated authority given "the statute's inclusion of the terms 'such as' and 'as determined by the Secretary,' and the broad grant of discretionary authority in [a companion provision]"). Whether or not that language delegates authority to a particular agency does not depend on the objective noun or phrase, and Teva cites no authority to the contrary.

Finally, Teva falls back on arguing that even if the word "determine" has import, it means only to "investigat[e] whether the generic is in fact on the market." Pls.' Opp'n & Reply at 30. But as Teva itself recognizes, that still requires CMS "to ascertain or establish something." *Id*. at 29. If Teva's interpretation were correct—that there is an objective, "binary yes-or-no fact of the marketplace," *id.* at 30—there would be nothing for CMS to "investigat[e]," and the word "determine" would be written out of the IRA, *but cf. Zhu*, 411 F.3d at 295.

**b.** Teva's remaining arguments are equally unavailing. Teva's attempt to analogize to the use of "marketed" in another part of the IRA fails. Teva asserts that 42 U.S.C. § 1320f-1(f)(1)(A) vests "far more discretion," in the Secretary and therefore establishes a lack of discretion in § 1320f-1(e)(1). Pls.' Opp'n & Reply at 30. In relevant part, § 1320f-1(f)(1)(A) directs the

25

Secretary to consider whether there is "a high likelihood . . . that a biosimilar . . . *will be* . . . marketed" by a set date.  *Id.* § 1320f-1(f)(1)(A) (emphasis added).  The IRA further instructs that "a high likelihood" that a biosimilar "will . . . be marketed" exists if certain "information"[21] submitted by a manufacturer provides "clear and convincing evidence" as such.  *Id.* § 1320f-1(f)(3)(B).  Teva posits that because the IRA does not similarly explicitly direct the Secretary to review certain information to determine whether a generic "is marketed," the Secretary necessarily lacks *any* discretion in interpreting that phrase.  *See* Pls.' Opp'n & Reply at 31.

But the fact that the IRA provides more instruction regarding how the Secretary should determine whether there is "a high likelihood" that a biosimilar "will be . . . marketed" in the future, 42 U.S.C. § 1320f-1(f)(1)(A), relative to how the Secretary should determine whether a generic "is . . . marketed," 42 U.S.C. § 1320f-1(e)(1)(A)(iii), (B)(iii), is neither relevant nor surprising.  As explained, the relevant inquiry is whether the statute uses language, such as "determine," that indicates a delegation of discretion.  *See* Defs.' Br. at 24; *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (noting that Congress "often enact[s]" statutes that "'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term" (citation omitted)); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, No. 23-975, 2025 WL 1520964, at *8 (U.S. May 29, 2025) (courts must defer to agencies' reasonable choices in exercising delegated authority).  Both provisions use such language and thus both provisions necessarily delegate a certain amount of discretion in their respective requirements.  In any event, determining whether "a high likelihood" exists that a biosimilar "will be . . . marketed," 42 U.S.C. § 1320f-1(f)(1)(A), is necessarily a more complicated inquiry than determining whether a generic "is . . . marketed," 42 U.S.C. § 1320f-1(e)(1)(A)(iii), (B)(iii).  The former requires prediction about future circumstances rather than an assessment of current circumstances.  Thus, Congress understandably provided further instruction to the Secretary in making that determination.

---

[21] This "information" includes certain agreements filed with the FTC or DOJ, *id.* § 1320f-1(f)(1)(B)(ii)(I)(bb); the manufacturing schedule submitted to FDA, *id.* § 1320f-1(f)(1)(B)(ii)(III)(aa); and marketing disclosures submitted to the SEC or otherwise distributed to shareholders, *id.* § 1320f-1(f)(1)(B)(ii)(III)(bb).

Indeed, Teva does not meaningfully dispute that Congress knows how to expressly cabin CMS's discretion when it wishes, as shown by the Inflation Rebate Program. There, Congress directed CMS to conduct a simple yes-or-no inquiry in determining whether a drug is "being marketed, as identified in the [FDA's] National Drug Code Directory." 42 U.S.C. 1395w-114b(g)(1)(C)(ii). Teva protests that this program looks to the directory only "to prove the *absence* of marketing." Pls.' Opp'n & Reply at 32. But that is exactly the point. If the drug is "being marketed" according to the directory, then the drug is "being marketed" for the purpose of the Inflation Rebate Program; and vice versa. That is, by definition, a yes-or-no inquiry. Notably, that provision also lacks discretionary language like "determine." 42 U.S.C. 1395w-114b(g)(1)(C)(ii). Congress did not cabin CMS's discretion in any similar way here, showing that Congress expected CMS to exercise broader discretion in the context of drug selection and deselection.

**c.** Nothing in the IRA suggests that CMS must deselect a drug in perpetuity once CMS determines that a generic or biosimilar is marketed at one point in time. *Cf.* Pls.' Opp'n & Reply at 32. In arguing to the contrary, Teva ignores Congress's choice of verb tense: As explained, the statute provides that a drug or biologic should not be identified as a qualifying single source drug if it is the listed drug or biologic for a generic or biosimilar that "*is* marketed." 42 U.S.C. § 1320f-1(e)(1) (emphasis added). That verb choice confirms that a drug may be selected if it does not have a generic or biosimilar that *is* being marketed.[22] Accordingly, should CMS determine that an existing generic or biosimilar has ceased to be marketed, the listed drug would again be eligible for selection for the next price applicability year. Teva's alternative interpretation would necessarily allow a manufacturer to avoid selection in perpetuity even if a generic or biosimilar was marketed one time, on one day, and then ceased being "marketed" forever. Again, this Court need not conclude that Congress enacted such a "self-defeating statute." *Pugin*, 599 U.S. at 607.

---

[22] Contrary to Teva's suggestion, *see* Pls.' Opp'n & Reply at 32-33, there is no grammatical or practical difference between "is marketed," 42 U.S.C. § 1320f-1(e)(1), and "continues to be marketed," 26 U.S.C. § 223(c)(2)(G)(ii)(II).

**d.**  Finally, contrary to Teva's suggestion that CMS's interpretation is "unknowable," Pls.' Opp'n & Reply at 34, CMS has explained how it will determine whether a generic or biosimilar is marketed on a bona fide basis:  CMS will consider "the totality of the circumstances"—including PDE and AMP data, and other data as relevant—which would reveal whether there is a regular and consistent volume of sales of any relevant generic or biosimilar product.  2027 Guidance at 20, 170-71; *see also id.* at 279 (considering "whether the generic drug or biosimilar is regularly and consistently available for purchase through the pharmaceutical supply chain").  There is nothing impermissibly "amorphous" about that standard.  Pls.' Opp'n & Reply at 34.  And for each of Teva's hypotheticals, a manufacturer can provide its own data as it sees fit to establish that its particular, unique circumstances constitute bona fide marketing.  A manufacturer need not know in advance precisely what CMS considers to be a regular and consistent volume of sales, *see* 2027 Guidance at 171, in order to provide data to meet that standard, *see Animal Legal Def. Fund, Inc. v. Glickman*, 204 F.3d 229, 235 (D.C. Cir. 2000) (courts "accord agencies broad deference in choosing the level of generality at which to articulate rules"); *see also, e.g.*, *id.* (collecting cases).

Moreover, specifying precise thresholds would only allow manufacturers to more easily game the system—if CMS required the sale of at least 100 pills, one could soon expect to see the "marketing" of exactly 101.  In any event, to the extent Teva is concerned with a purported lack of precision, such an argument would more properly be considered as an arbitrary-and-capricious claim, or perhaps even a due process vagueness challenge—neither of which Teva brings here.  The level of specificity of CMS's guidance has no connection to whether it exceeds CMS's statutory authority, which is the only question before the Court on this claim.

Ultimately, CMS's common-sense interpretation of the statute will not cause any problems for those engaged in good faith—or, in other words, bona fide—generic competition.  Given that Teva itself asserts that it "intends to market [its] generics to the maximum extent possible, as permitted by law," Pls.' Opp'n & Reply at 36, Teva has nothing to fear from CMS's interpretation.

## III.    PLAINTIFFS' DUE PROCESS CLAIMS LACK MERIT.

Teva fails to establish the first requirement of any due process claim because it cannot show that the Negotiation Program deprives it of any protected property interest.  Instead, Teva's arguments are all premised on a nonexistent right to demand that the government forever pay Teva's preferred prices, for both its brand-name and generic drugs.  But as the Third Circuit recently recognized in rejecting a materially identical claim challenging this program, the federal patent laws do not confer any such right.  *See AstraZeneca*, 137 F.4th at 125.  Nor can Teva premise this purported right on portions of the Medicare Act that no longer apply to covered Part D drugs. In any event, because participation in the Negotiation Program is "completely voluntary," *Dayton Area Chamber of Com. v. Becerra*, 696 F. Supp. 3d 440, 456 (S.D. Ohio 2023), Teva has not shown a deprivation of any protected interest.

### A.    The Negotiation Program does not deprive Teva of any protected property interests.

The Negotiation Program does not deprive Teva of any property interests in its patent rights, nor does it deprive Teva of now-defunct statutory rights.  And contrary to Teva's insistence that its role as a generic manufacturer subjects it to a "broader swath of harm" than brand-name manufacturers, Pls.' Opp'n & Reply at 37, that role provides even weaker, more attenuated claims.

**a.**  The Negotiation Program does not deprive Teva of any patent-related property interests, with respect to either its brand-name drugs or its generic drugs.  Teva concedes, as it must, that the federal patent laws "do not entitle a patentee to receive any particular price."  *Id.* at 38-39 (citing Defs.' Br. at 33).  Teva nonetheless attempts to get out from under this principle by arguing that it doesn't seek a "*categorical* right to charge a particular price," but rather only a right to charge a particular price during the period of exclusivity.  *Id.* at 39.  That is a distinction without a difference.  As the Third Circuit recently explained, given that "federal patent laws do not confer a right to sell at all, they do not confer a right to sell at a particular price"—including during "a product's exclusivity period."  *AstraZeneca*, 137 F.4th at 125.  In other words, there is simply "no

protected property interest in selling goods to Medicare beneficiaries . . . at a price higher than what the government is willing to pay when it reimburses those costs." *Id.*

The same is true of Teva's patent-related interests in its generic drugs. Teva protests that its interests in its generic drugs are "unique" because they often involve licensing agreements with brand-name manufacturers. Pls.' Opp'n & Reply at 37-38. Teva argues that it has a property interest in these licensing agreements, and that the value of these licensing agreements decreases if the brand-name drug is selected for the Negotiation Program. *See id.* at 38. But this theory is even more attenuated than Teva's purported patent-related property interests in its brand-name drugs. If the patent laws do not confer a right to sell at a particular price—as Teva does not contest as a general matter, *see id.* at 39—then patent licensing agreements necessarily cannot confer a constitutionally protected right to sell at a particular price. *See, e.g.*, *Cuban Cigar Brands, N.V. v. Tabacalera Popular Cubana, Inc.*, No. 02-23124-CIV, 2008 WL 4279641, at *4 (S.D. Fla. Sept. 16, 2008) (finding third-party's interest in patent via licensing agreement conferred no due process right to participate in debt proceedings because third-party "does not own anything by virtue of the license agreement; it merely possesses the right to use Defendants' trademark").

As Defendants have explained, these principles work the same way where, as here, the buyer is the government. *See* Defs.' Br. at 33. Teva responds by asserting that the government is acting here as a "regulator" rather than a true "buyer," because it does not "direct[ly] purchas[e]" drugs "from drug manufacturers," Pls.' Opp'n & Reply at 40-41—it just pays for them, on behalf of Medicare beneficiaries. But the complexity of this supply chain does not change the relevant point, which is that "the Negotiation program only sets prices for drugs *that CMS pays for* when it reimburses sponsors." *AstraZeneca*, 137 F.4th at 125-26. The Negotiation Program does not set the price for any drug payments that occur outside the bounds of the Negotiation Program—only for drugs that the *government* is paying for. For example, if a Medicare beneficiary sought to pay cash for a selected drug (instead of going through Medicare), then manufacturers and pharmacies

can charge that beneficiary whatever price they want.[23]    In negotiating the price that *the government* will pay for drugs, the government is thus acting as a market participant.    And pharmaceutical companies have no right—let alone a constitutional right—to force the government to pay more than it is willing to pay.

    **b.**    Teva next asserts that it has a protected property interest in "long prevail[ing]" market rates for Medicare Part D transactions based on a statute that is no longer operative.    Pls.' Opp'n & Reply at 41.    Teva cites its alleged statutory right under 42 U.S.C. § 1395w-111(i)(1) "to be free from governmental price strictures" in connection with the price of certain covered Part D drugs. Pls.' Mot. at 38.    But Congress rescinded that statutory right when it enacted the IRA.    And Teva concedes that Congress can take away that sort of statutory right.    *See* Pls.' Opp'n & Reply at 42. Teva also concedes that "[t]he IRA created an exception to the general rule that CMS 'may not institute a price structure.'"    *Id.*    Despite those concessions, Teva argues that Congress did not in fact take away its interest in being "free from governmental price strictures," Pls.' Mot. at 38, because the IRA did not explicitly excise 42 U.S.C. § 1395w-111(i)(1) from the U.S. code, *see* Pls.' Opp'n & Reply at 42.    But Congress's enactment of the IRA clearly modified the terms and conditions of how the government pays for Part D drugs through Medicare, and the mere fact that Congress did not explicitly excise § 1395w-111(i)(1) in doing so is irrelevant.    That is not a "contingent right," Pls.' Opp'n & Reply at 42—it is a defunct right.

    Nor does Teva have a property interest in some undefined "course of dealing."    *Id.* at 41 (citation omitted).    To the extent Teva contends that § 1395w-111(i)(1) itself created a "protected expectation in receiving the market rates," *id.*, Defendants have already explained—and Teva now concedes—that Congress may amend or repeal statutory rights that it has previously created, *see* Defs.' Br. at 31-32; Pls.' Opp'n & Reply at 42. Teva does not even attempt to otherwise explain how "conduct" and "practice" bestow upon it the right to seek a particular price when selling its

---

    [23] A beneficiary may choose to "pay cash" if, for example, the pharmacy's cash price is cheaper than the Part D plan's negotiated price; or (if the drug is generic) cheaper than the Part D copay; or because the individual does not want to use their insurance for certain medications for any reason.

drugs to the government. Pls.' Opp'n & Reply at 41. The sole case on which Teva relies for this proposition sounds in contract law, and Teva does not explain how it has any such "implied" contractual right to demand that the government pay a particular price. *See Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 782-83 (2d Cir. 1991) (holding plaintiff had property interest in Chief Resident position because defendant had adopted "a policy and practice of awarding the position of Chief Resident to all third year residents on a rotating basis").

Teva fails to cite any other authority suggesting it is forever entitled to a particular price as a matter of constitutional right. *Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768 (7th Cir. 2021), and *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773 (1980), are inapposite. Pls.' Opp'n & Reply at 41-42. As Defendants already explained, *see* Defs.' Br. at 32-33, those cases were premised on settled statutory interests: a right to the "legally prescribed rate [of reimbursement]," *Rock River Health Care*, 14 F.4th at 774, and a "right to choose among a range of *qualified* providers, without government interference," *O'Bannon*, 447 U.S. at 785. Teva cites no provision of the IRA (or elsewhere) that entitles it to a right to charge the government a particular price, nor any other right of noninterference that remains in effect.

Finally, Teva insists that *Old Dearborn Distribution Co. v. Seagram-Distillers Corp.*, 299 U.S. 183, 192 (1936), remains relevant to the extent it protects the right to "decide the terms on which one will dispose of property," Pls.' Opp'n & Reply at 42-43. But the Negotiation Program does not deprive Teva of any right to "dispose" of its drugs. *Id*. As explained, the Negotiation Program does not require manufacturers to provide physical access to drugs at all. *See* Defs.' Br. at 35. Indeed, Teva concedes as much. *See* Pls.' Opp'n & Reply at 40 (arguing the CMS is "*not* an ordinary 'buyer' of drugs"). And the right to dispose of property is not a right to demand a particular price for that property. Teva's citation to *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021), is likewise of no assistance. That case explains only why the "right to exclude"—not the right to "dispose"—means that government-authorized physical invasions of property are "physical takings" under the Takings Clause. That case is irrelevant here, given the lack of any

physical invasion or appropriation of Teva's property—it need not sell any of its drugs at all (including to Medicare), if it does not wish to.

## B.    Participation in the Negotiation Program is voluntary.

As every court to consider the question has concluded, participation in the Negotiation Programs is "completely voluntary." *Chamber*, 696 F. Supp. 3d at 456.  Teva attempts to obscure the issue by asserting that voluntariness is irrelevant to procedural due process.  But Teva itself put the voluntariness of its participation at issue by resting its due process arguments on the theory that "government dictates" force it "to sell its product at prices it deems insufficient."  *See, e.g.*, Pls.' Mot. at 41.  The absence of government coercion refutes that argument.  Because the IRA does not "legally compel[]" participation, it therefore does not deprive Teva of any of Teva's asserted property interests. *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993).

Attempting to evade this precedent, Teva argues that the IRA imposes a "gun to the head" vis-à-vis the excise tax. Pls.' Opp'n & Reply at 46 (citation omitted); *see also id.* at 47-48 (arguing that CMS does not act as a market participant if it imposes "fine[s]" for failure to participate).  While the excise tax gives pharmaceutical companies that do not wish to participate in the Negotiation Program another alternative to withdrawing from Medicare and Medicaid altogether—*i.e.*, continuing to sell their drugs to Medicare at non-negotiated prices and paying a tax on those sales, 26 U.S.C. § 5000D—that is only one way to reject the government's offer.  A manufacturer could instead opt out of business with the government by withdrawing from Medicare and Medicaid, thus avoiding the excise tax and retaining its ability to sell its drugs to other buyers.  *See* 2027 Guidance at 234.  Or a manufacturer could divest its interest in a selected drug or end Medicare sales of a selected drug while continuing to sell its other drugs to Medicare. *See id.* at 236-27.  There are thus several ways for Teva to "opt out" of this program.  *Chamber*, 696 F. Supp. 3d at 457.  But because there is "no constitutional right (or requirement) to engage in

business with the government, the consequences of that participation cannot be considered a constitutional violation" in this context.  *Id.*[24]

Teva makes much of the fact that it sells not only brand-name drugs, but also generic drugs.  Pls.' Opp'n & Reply at 37, 46-47.  But, to the extent that Teva brings claims in its capacity as a generic manufacturer, such claims are even weaker and more attenuated than Teva's claims brought as a brand-name manufacturer.  Indeed, given that every court to have addressed the question has held that the Negotiation Program does not deprive brand-name manufacturers of any property interest, it would be surprising to conclude that the Negotiation Program deprives generic manufacturers—who do not participate in the Negotiation Program at all—of any constitutionally protected property interests.  *See* Defs.' Br. at 7-8 (collecting cases).  For example, Teva protests that it lacks any choice in participating in the Negotiation Program with regard to its generic drugs.  But Teva cannot be an *involuntary* participant in a Program in which it does not participate *at all*.  To the contrary, under the IRA, Teva may sell its generic drugs at whatever price it wants, both to Medicare beneficiaries and non-beneficiaries—generic drugs are not eligible for negotiation.  And the fact that the government has set terms by which it will pay Teva's *competitors* for certain drugs does not implicate (much less violate) Teva's constitutional rights.

Finally, Teva resorts to arguing that participation in the Negotiation Program is involuntary because "[t]he federal government dominates the healthcare market."  Pls.' Opp'n & Reply at 48.  But Teva fails to respond to Defendants' lengthy explanation, *see* Defs.' Br. at 36-37, that economic or other practical "hardship is not equivalent to legal compulsion for purposes of" the Fifth Amendment, *Garelick*, 987 F.2d at 917; *see also St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 875 (7th Cir. 1983) (the "fact that practicalities may in some cases dictate participation does

---

[24] Teva suggests that its participation is involuntary because the government has too much to lose if Teva were to withdraw from the Negotiation Program.  Pls.' Opp'n & Reply at 48.  In particular, Teva notes that Medicare Part D plans must cover at least two drugs per "therapeutic category and class," 42 U.S.C. § 1395w-104(b)(3)(C)(i), and Teva manufacturers one of only two covered drugs indicated for the treatment of tardive dyskinesia.  If anything, however, this only highlights *Teva's* negotiating leverage.

not make participation involuntary"). Indeed, Plaintiffs fail to identify a single case supporting the premise that participation in Medicare is involuntary based on the program's lucrative nature, including the government's purported market power. For good reason. Congress enacted Medicare, and imposed conditions on participation, pursuant to its Spending Clause powers. "Unlike ordinary legislation, which imposes congressional policy on regulated parties involuntarily, Spending Clause legislation operates based on consent: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022) (internal quotes and citation omitted). A party cannot be coerced by such an offer because there is no "right (or requirement)" to conduct business with the government in the first instance. *Chamber*, 696 F. Supp. 3d at 457; *see, e.g.*, *Shah v. Azar*, 920 F.3d 987, 998 (5th Cir. 2019) ("[P]articipation in the federal Medicare reimbursement program is not a property interest."). "[N]o one has a 'right' to sell to the government that which the government does not wish to buy." *Coyne-Delany Co. v. Cap. Dev. Bd.*, 616 F.2d 341, 342 (7th Cir. 1980); *see also Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940) (government has authority to "determine those with whom it will deal").

This fact distinguishes Medicare from the regulatory context in *Valancourt Books, LLC v. Garland*, 82 F.4th 1222 (D.C. Cir. 2023). Plaintiffs in *Valancourt Books* were subject to a regulatory regime they could not readily exit—and they thus had to comply with the government's conditions if they wished to sell their products to *anyone*. *See id.* at 1239 (holder of copyright was subject to "a demand letter indicating no option other than surrendering the property at issue"). By contrast, the IRA does not prevent manufacturers who are unwilling to participate in the Negotiation Program from selling their drugs to anyone but the government—and those manufacturers would then not need to comply with any of the Negotiation Program's requirements. *See Chamber*, 696 F. Supp. 3d at 457. That makes the Program voluntary, and valid.

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' statutory claims for lack of subject-matter jurisdiction and enter summary judgment for Defendants on Plaintiffs' due process claims.

Date: June 12, 2025                    Respectfully submitted,

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

MICHELLE R. BENNETT
Assistant Branch Director
Federal Programs Branch

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. 995500)
 Senior Trial Counsel
CASSANDRA M. SNYDER (D.C. 1671667)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 305-8576
stephen.pezzi@usdoj.gov

*Counsel for Defendants*